**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

| | |
|---|---|
| FOUR IN ONE COMPANY, INC., on behalf of itself and all other similarly situated, | |
| Plaintiff, | CASE NO. |
| v. | **CLASS ACTION COMPLAINT** |
| SK FOODS, L.P., INGOMAR PACKING COMPANY, LOS GATOS TOMATO PRODUCTS, RANDALL RAHAL , INTRAMARK USA, INCORPORATED. | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, individually and on behalf of a class of all those similarly situated, brings this action for damages under the antitrust laws and racketeering laws of the United States against Defendants, and alleges as follows:

**NATURE OF THE ACTION**

1.      This action arises from Defendants' illegal anticompetitive conduct in the United States market for the sale of processed tomato products.  Upon information and belief, this conduct is the subject of an ongoing federal grand jury investigation being conducted by the United States Attorney's Office in Sacramento.

2.      Plaintiff Four In One Company, Inc. ("Plaintiff" or "Four In One") brings this action on behalf of itself, as well as on behalf of a proposed class of entities that purchased processed tomato products directly from one or more of the named Defendants (those direct purchasers defined herein as the "Class") between January 2006 and through to and including at least December 2008 (the "Class Period").

3.      As detailed herein, Defendants SK Foods, L.P. ("SK"), Intramark USA, Inc. ("Intramark") and Randall Lee Rahal, together with other unnamed co-conspirators, conspired to allocate contracts for the sale of processed tomato products; fix prices for, and submit collusive,

noncompetitive, and rigged bids for the contracts for the sale of processed tomato products; and provide product and receive payment from customers as a result of the allocation agreements and collusive bidding.  Through acts of bribery, Defendants SK, Intramark, and Rahal, together with unnamed co-conspirators, also sought to ensure that customers purchased processed tomato products at inflated prices from SK rather than from its competitors and to induce purchasing agents for company customers to disclose to SK the bidding and proprietary information of certain SK competitors.  Through this conduct, Defendants SK, Intramark, and Rahal, together with unnamed co-conspirators, conducted the affairs of an enterprise through a pattern of racketeering activity.

4.     As also alleged herein, during the same period, SK conspired separately with defendants Ingomar Packing Company ("Ingomar") and Los Gatos Tomato Products ("LG"), together with unnamed co-conspirators, to suppress and restrain competition for and to fix, maintain, and/or stabilize the price of processed tomato products sold in the United States.

5.     As a direct and proximate result of the anticompetitive conduct alleged herein, Defendants have restrained competition in the United States market for the sale of processed tomato products and injured Plaintiff and the Class in their business and property.  Plaintiff and members of the Class have each paid a higher price for processed tomato products than they would have paid absent the concerted unlawful activity alleged herein. Through this course of illegal conduct, Defendants substantially increased their profits.  Plaintiffs and the members of the Class have each also been injured by the conduct alleged herein that gives rise to relief pursuant to 18 U.S.C. § 1962 *et seq.* and 1964.

6.     Plaintiff seeks damages on behalf of itself and the Class.  Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from any purchases of processed tomato products not made directly from one or more of the Defendants.

CLASS ACTION COMPLAINT

**PARTIES**

**A.    Plaintiff**

7.      Plaintiff Four In One Company, Inc. ("Four In One") is a corporation organized under the laws of the State of California, with its principal place of business at 420 Clyde Avenue, Mountain View, California 94043.

8.      Four In One manufactures pickled fruits and vegetables, vegetable sauces, seasonings and salad dressings.

9.      During the Class Period, Four In One purchased from one or more of the Defendants large quantities of tomato paste and other processed tomato products for use in its manufacturing process.  The prices Four and One paid to one or more Defendants for processed tomato products were greater than the prices it would have paid absent the conduct alleged herein. Four In One has therefore been injured in its business and property by reason of Defendants' antitrust violations, and by reason of the conduct alleged herein giving rise to relief under 18 U.S.C. § 1962 *et seq.*

**B.    Defendants**

10.     Defendant SK Foods, L.P. ("SK") is a limited partnership with its corporate headquarters located at 21 Lower Ragsdale Drive, Monterey, CA 93940.  SK is a leading processor of tomato paste, diced tomatoes, and fresh-packed sauces and salsas.

11.     Defendant Los Gatos Tomato Products ("LG") has its principal place of business at 19800 Gale Avenue, P.O. Box 429, Huron, CA 93234.  LG is a partnership of four family farming operations that produce tomato paste.

12.     Defendant Ingomar Packing Company ("Ingomar") has its principal place of business at 9950 S. Ingomar Grade, Los Banos, CA 93635.  Ingomar is a producer and processor of tomatoes.  Since 1983 Ingomar has grown tomatoes and processed and packaged tomato paste.

13.     Defendant Intramark USA, Incorporated ("Intramark") is a New Jersey-based company operating out of leased office space at 220 Kinderkamack Road, Westwood, NJ, 07675.  Intramark is owned and operated by Defendant Randall Lee Rahal.  Intramark acts on behalf of itself and others in selling processed tomato products to customers.

14.     Defendant Randall Lee Rahal is a New Jersey resident.  Rahal is the President of Intramark USA, Inc.  Through Intramark, Rahal worked on behalf of SK as a broker for the sale of processed tomato products.

## JURISDICTION AND VENUE

15.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained by Plaintiff and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16.     This action is also brought pursuant to 18 U.S.C. § 1962 *et seq.*

17.     Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

18.     Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391 because during the Class Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.

19.     This Court has personal jurisdiction over each Defendant because, among other things, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered processed tomato products in this District; (c) has substantial aggregate contacts with this District; and/or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

20.     Upon information and belief, a federal grand jury investigation of the conduct alleged herein is pending in this District.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated.  The proposed "Class" is defined as:

-4-

All persons and entities who purchased processed tomato products in the United States directly from one or more Defendant during the Class Period.  Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint and all governmental entities, and any judges or justices assigned to hear any aspect of this action.

22.     While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that the identities of Class members can be readily ascertained from Defendants' books and records.  Given the magnitude of the commerce involved, there are most likely thousands of class members geographically dispersed throughout the United States, making joinder of all members impracticable.

23.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased processed tomato products from one or more of the Defendants.  Plaintiff and the other members of the Class were damaged by the same wrongful conduct of the Defendants and the relief sought is common to the Class.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and is represented by counsel competent and experienced in class actions and antitrust litigation.

25.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     Whether Defendants conspired, contracted or combined with others, for the purpose and with the effect of restricting competition for and raising, fixing, maintaining, pegging, or stabilizing the price of processed tomato products sold in the United States;

b.     Whether Defendants' conduct violated the federal antitrust laws;

c.     Whether Defendants' conduct caused the price of processed tomato products sold in the United States to be at artificially high and supracompetitive levels;

d.      Whether Defendants' conducted the affairs of an enterprise through a
pattern of racketeering activity and thereby are liable to members of the
class pursuant to 18 U.S.C. § 1962 *et seq.*;

e.      Whether Defendants' conduct caused injury to the business and property of
Plaintiff and the Class and, if so, the proper measure of damages.

26.     A class action is superior to any other available methods for the fair and efficient
adjudication of this controversy, since joinder of all Class members is impracticable.  The
prosecution of separate actions by individual members of the Class would impose heavy burdens
upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications
of the questions of law and fact common to the Class.  A class action, on the other hand, would
achieve substantial economies of time, effort and expense and would assure uniformity of decision
as to persons similarly situated, without sacrificing procedural fairness or bringing about other
undesirable results.  No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

27.     During the Class Period, Defendants directly sold processed tomato products in a
continuous and uninterrupted flow of interstate commerce, including through and into this judicial
district.

28.     The Defendants' activities have had a direct, substantial, and reasonably foreseeable
effect on interstate commerce in the United States and have caused antitrust injury in the United
States, as well as injury actionable under 18 U.S.C. § 1962 *et seq.*

## FACTUAL ALLEGATIONS

**The Processed Tomato Products Industry**

29.     The tomato product market consists of processed and canned tomatoes sold to re-
manufacturers, retail and food service marketers.  Products in this market include, among other
things, diced tomatoes, tomato paste, and tomato sauces.

30.     Approximately 95% of tomatoes grown in the United States are processed in
California.

31.    Tomato "paste," a processed tomato product, is sold to companies and used as an ingredient for the manufacturing of end-products, such as ketchup, sauce, salsa, soups and juices. Over the last several years, over 2 billion pounds of tomato paste have been produced annually in the United States, with a market value at current average prices of over $800 million.

32.    Defendants SK, Ingomar, and LG are leading producers of tomato paste and other processed tomato products.

**The SK Bribery Scheme**

33.    Defendants SK, Intramark and Rahal, together with unnamed co-conspirators, engaged, beginning at least as early as 2006, in a scheme to restrain competition by bribing the purchasing agents for direct purchasers of processed tomato products, so that those purchasing agents would agree to buy SK processed tomato products at supracompetitive prices and otherwise assist SK in undermining fair competition in the sale of processed tomato products.

34.    Defendant Rahal is a broker for the sale of processed tomato products and president of Defendant Intramark.  SK conspired with Intramark and Rahal and other unnamed co-conspirators to plan and implement the bribery scheme.

35.    As a processed tomato products sales broker for SK, Rahal oversaw the negotiation and execution of contracts between SK and many direct purchasers of processed tomato products.

36.    On December 10, 2008, a three-count felony Information was filed in the United States District Court for the Eastern District of California in Sacramento, CA, charging Rahal with racketeering, money laundering, and antitrust violations based on his actions as sales broker for SK Foods ("the Information").  The Information includes as Count Three a charge of price fixing in violation of 15 U.S.C. § 1.  The Information charges that beginning at least as early as February 2006 and continuing until approximately April 2008, Rahal, acting as owner of Intramark and on behalf of SK, and unnamed co-conspirators entered into and engaged in a combination and conspiracy to suppress and restrain competition for processed tomato products sold in the United States, in unreasonable restraint of interstate trade and commerce.

37.     The Information reflects that the combination and conspiracy consisted of a continuing agreement, understanding and concert of action among Rahal (acting as owner of Intramark and on behalf of SK) and SK, Intramark and other unnamed co-conspirators, the substantial terms of which were to allocate among the Rahal and the conspirators contracts for the sale of processed tomato products; to fix prices for, and submit collusive, noncompetitive, and rigged bids for contracts for the sale of processed tomato products; and to provide product and receive payment from customers as a result of the allocation and collusive bidding.  The Information charges that the conspirators did the things they combined and conspired to do, including, among other things, participating in meetings, conversations, and communications to discuss the prices of processed tomato products; agreeing, during those meetings, conversations and communications, to fix prices of processed tomato products to charge to customers located in the United States; and to issue price quotations in accordance with the agreements reached.

38.     Conduct in furtherance of the anticompetitive scheme has been described in detail in a sworn affidavit, dated August 14, 2008, of FBI Special Agent Paul S. Artley, in the forfeiture action pending in this District and captioned *United States of America v. Approximately $415,000.00 in U.S. Currency Seized from Sun National Bank Account Number 4750855637, Held in the Name of Intramark USA, Inc.* (E.D. Cal.).  Special Agent Artley's declaration states that he is currently assigned to the FBI Sacramento Division.

39.     Special Agent Artley's declaration explains how the scheme involved bribing the purchasing agents of direct purchasers of processed tomato products, so that these purchasing agents would agree to purchase SK products at supracompetitive prices and otherwise assist Rahal and SK in undermining fair competition in the sale of processed tomato products.  The declaration describes, among other things, the direct involvement of SK and Scott Salyer, CEO of SK during the relevant period.

40.     Special Agent Artley's declaration explains that a witness employed by SK  during the relevant time period ("Witness # 1) reported that Rahal made payoffs through his own company, Intramark, to insulate SK from fallouts or lawsuits in the event that he was apprehended making bribes.  According to the declaration, Witness # 1 described one method used by Rahal in

the bribery scheme as dropping a $100 bill and picking it up saying, "You must have dropped this, is it yours?"  According to the witness, if the individual said "yes," Rahal knew the customer was open to a bribe, described by Rahal to the witness as a "business offer."  The witness reported that according to Rahal, the first payment assured the purchasing agent's loyalty and allowed Rahal to take advantage of that relationship.

41.     Special Agent Artley's declaration sets forth specific evidence, provided by aforementioned Witness #1 and other current or former employees of SK, regarding bribes that Rahal, on behalf of SK, paid to individuals responsible for purchases of processed tomato products for a company called Agusa, Inc.  The declaration reports that:

a.     On April 16, 2008, a person identified as "J.D.", the individual at Agusa with whom Rahal dealt on behalf of SK during the relevant time period, admitted to accepting payments from Rahal relating to the purchase by Agusa of processed tomato products from SK.

b.     On June 21, 2007, FBI agents intercepted a call from Rahal to J.D. after J.D. placed an order with SK.  Rahal told J.D. that he needed him to stay in his job for a few years. When J.D. told Rahal he didn't know if J.D.'s employer would allow that, Rahal told J.D. that he would help brace some of J.D.'s pain if he stayed.

c.     On July 13, 2007, FBI agents intercepted a call in which Rahal stated to Scott Salyer, CEO of SK, "I got to see my friend [J.D.] over at Agusa, he's now my best friend, and give him something. He told me, he's doing exactly what he told me, he's rejecting that Chinese paste left and right." Salyer responded, "Perfect, but it's small volumes." Rahal responded, "I know, but we started at zero volume and I don't think we'll ever be a big player in there, I don't think the Mendios (owners of Agusa) will ever let us be a big player, unless there's a catastrophe." Salyer stated, "unless they start rejecting everybody else's paste, too." Rahal replied, "you never know what can happen, a little bit of money in the right place can do." Salyer stated,'

CLASS ACTION COMPLAINT

1      "I've heard about that type of s--- happening, sample bags thrown away,

2      results changed, there's all kinds of s--- can happen."

3    d.    On July 18, 2007, FBI agents intercepted a call from Rahal to SK employee

4      "T.M." in which Rahal told T.M. he planned on meeting with J.D. from

5      Agusa.  Rahal asked T.M. about the type and amount of product sold to

6      Agusa.  Rahal stated, "the total amount now we have booked, that we've got

7      sold to Agusa, is one million two hundred thousand pounds. Correct?" T.M.

8      replied, "Yes, that's what we have that he said that he was gonna do is five

9      hundred and another seven." Rahal then stated, "Cause I'm paying him on a

10      million two then, right?"  T.M. replied "Yes."  Rahal concluded the

11      conversation by stating, "O.K. I just wanted to make sure. If I give him

12      money, I want to make damn sure what the hell I'm paying him for."

13    e.    Based on the substance of these phone calls, FBI agents conducted

14      surveillance on July 18, 2007 and witnessed Rahal meet with J.D. at a

15      restaurant in Lemoore, California. During the meeting, agents photographed

16      Rahal handing J.D. a Bank of America envelope. Rahal was overheard

17      telling J.D. "put that in your pocket" and words to the effect, "the more you

18      can give me, the more you will get. . . I don't need it, you do." At the end of

19      the conversation, Rahal asked J.D. to provide him with a list of his sales

20      customers and the contract prices.

21    f.    On July 19, 2007, a call was intercepted between Rahal and J.D. in which

22      Rahal asked for the "information" to be sent to him via email. Rahal also

23      asked for Agusa's financial statements. After J.D. expressed hesitation,

24      Rahal stated "it won't go anywhere. I'll look at it and I'll destroy it."

25    42.    Special Agent Artley's declaration also sets forth specific evidence, provided by

26 aforementioned Witness #1 and other current or former employees of SK, regarding bribes that

27 Rahal, on behalf of SK, paid to individuals responsible for purchases for a company called B&G

28 Foods.  The declaration reports that:

CLASS ACTION COMPLAINT

a.   A person identified as "R.T." was the individual at B&G Foods with whom Rahal dealt on behalf of SK during the relevant time period.  A business card states that R.T. is the "Corporate Purchasing Manager" at B&G Foods.

b.   On June 8, 2007, a call was intercepted between Rahal and R.T., purchasing manager for B&G Foods.  Rahal and R.T. agreed to "split the penny" on chile contracts. Special Agent Artley's declaration states that he believed this means that R.T. would receive a kickback of % cent per pound of the total quantity of chile peppers and jalapenos that B&G Foods purchased from SK.  Rahal would also receive a % cent per pound. Rahal told R.T. "I don't know how big your chile purchase is, but it can be a lot of money. It's your kids' education."

c.   On July 12, 2007, in an intercepted call, Rahal told R.T. just want to make sure that you know that you're getting half of that 13 million pounds. "That's yours." R.T. replied, "All right." Rahal then stated, "that's a penny on 13 is $130,000. So you're getting half of that . . . make no bones about it." R.T. replied, "Okay." Rahal then told R.T. that he would pay R.T. "once that money starts, comes in, I don't care how you take it."

d.   Bank records for Intramark show Intramark checks made out to "V.T." (R.T.'s wife), for the period January 2004 through December 2007. Five checks totaling approximately $15,000 were issued. The checks appear to be signed by Rahal.

43.   Special Agent Artley's declaration also sets forth specific evidence, provided by aforementioned Witness #1 and other current or former employees of SK, regarding bribes that Rahal, on behalf of SK, paid to individuals responsible for purchases for Frito-Lay North America, Inc.  The declaration reports that:

a.   On April 16, 2008, an individual identified as "J.W.", the individual at Frito-Lay with whom Rahal dealt on behalf of SK during the relevant time period, admitted to accepting payments from Rahal relating to the purchase

1    of products by Frito-Lay from SK. A business card states that J.W. is the

2    "Manager, New Products & Analysis Ingredients Purchasing" at Frito-Lay.

3    b.    Bank records for Intramark from January 2004 through December 2007

4    show Intramark checks totaling approximately $81,000 being paid to J.W.

5    The checks appear to be signed with Rahal's name.

6    c.    J.W.'s tax returns from 2003 through 2006 show, in addition to his earnings

7    at Frito-Lay, $66,500 of gross receipts for a consulting business. J.W.

8    received 1099s from Intramark from 2004 through 2006 which were the

9    same as the amount J.W. claimed as gross earnings from his consulting

10    business.

11    d.    On March 3, 2008, agents intercepted a phone call in which J.W. and Rahal

12    discussed supplying Frito- Lay with jalapenos.  During that call, Rahal

13    stated "I'll tell you what it is working good, is White Oak and this jalapeno

14    thing, and the money is now coming in." J.W. responded, "OK, good."

15    Rahal concluded, "So [Rahal's bookkeeper] will be here Wednesday . . .

16    we'll just keep doing that, she wants to do it the same way she did before."

17    Special Agent Artley declared, "It is believed that Rahal was telling J.W.

18    that since the payment was coming into Rahal for the jalapenos, his

19    bookkeeper would be sending J.W. his part of the 'payment' and that she

20    would send it to J.W. in the same manner that she had paid him the

21    bribes/kickbacks on the tomato contracts."

22    e.    On March 26, 2008, FBI agents intercepted a call in which Intramark's

23    bookkeeper received an incoming call from J.W. who instructed her to send

24    the package from Intramark to him at Frito- Lay.  J.W. stated that the

25    package should be sent to 7701 Legacy Drive, Plano, TX 75024.  Two

26    minutes later, Rahal made an outgoing call on his cell phone to J.W.  Rahal

27    asked why J.W. was having the package sent to his office at Frito- Lay.

28    J.W. responded, "So I can get it and put it in, because my bank is over here

CLASS ACTION COMPLAINT

1                      anyway." Rahal replied, "[bookkeeper] will put return address of her house

2                      in Jersey, and UPS it, it'll have [bookkeeper's] name on it." Rahal said J.W.

3                      should have the package by tomorrow, but he was not comfortable sending

4                      it to J.W. at his office at Frito- Lay but added, "you do what you want."

5       44.       Special Agent Artley's declaration also sets forth specific evidence, provided by

6 aforementioned Witness #1 and other current or former employees of SK, regarding bribes that

7 Rahal, on behalf of SK, paid to individuals responsible for purchases of processed tomato products

8 for Kraft, Inc.  The declaration reports that:

9              a.      On April 16, 2008, an individual identified as "R.W.", the individual at

10                   Kraft with whom Rahal dealt on behalf of SK during the relevant time

11                   period, admitted to accepting payments from Rahal relating to the purchase

12                   of products by Kraft from SK.

13              b.      Intramark's bank records indicate Intramark checks totaling approximately

14                   $157,000 written to R.W. from January 2004 through December 2007,

15                   some of which indicate "tomato paste" or "bill and hold" in the memo

16                   section. R.W. did not report $23,000 received from Intramark on his 2004

17                   tax return.

18              c.      On June 6, 2007, in an intercepted telephone conversation between Rahal

19                   and R.W., Rahal was talking about an invoice from Kraft that needed to be

20                   paid. Rahal told R.W. "you and I got money in there."  Special Agent Artley

21                   believed this meant once Kraft paid its "bill," Rahal would kickback some

22                   of the proceeds to R.W.

23              d.      In a call later that day, Rahal and R.W. discussed buying health insurance

24                   for R.W.'s daughter. Rahal said he checked about putting R.W.'s daughter

25                   on his payroll, but thought it would be cheaper for her to go out and get the

26                   best insurance she can on her own and Rahal could pay for it as soon as

27                   they make the deal.

28

CLASS ACTION COMPLAINT

e.    On July 12, 2007, in an intercepted telephone conversation between Rahal and R.W. (Kraft), Rahal told R.W. that Rahal was going to wait on sending a check to R.W. until he received some more invoices from Kraft so Rahal could send R.W. a bigger check.

f.    On July 26, 2007, in an intercepted telephone conversation between Rahal and R.W. (Kraft), Rahal told R.W. that he just mailed out a check for $17,000 to him. Bank records confirm that a check dated July 25, 2007 from Intramark to R.W. for $17,253 was cashed.

g.    On April 2, 2008, agents intercepted a telephone conversation between Rahal and A.H. in which Rahal said, "R.W. is sending me the offer from C.R. [the owner of Morning Star- competitor of SK] by fax, but not from his [R.W.'s] office and not from his (R.W.'s) personal fax. He's going to go outside and try to send it to me. Do you want me to send that? Who do you want me to send that to?" A.H. replied, "send it to me." Rahal stated, "that's as far as it goes then."

h.    Later the same day, Rahal called R.W. and told R.W. to fax Morning Star's bid information to Rahal's home "where you sent the last time" and provided R.W. with the fax number for Rahal's wife. Rahal stated, "I don't want you to send it here. Send it not from your Office." In a call later the same day, Rahal told R.W., "I think it would be better for you to mail that instead of faxing it even though you're faxing it from your home. I'll give you my address and you can mail it to me." Rahal then provided R.W. with his home address. Based on the context of the call, it appears Rahal, R.W. and A.H. are aware that it is improper for R.W. to be giving the competitor's proprietary information to Rahal for SK' benefit. Special Agent Artley concluded that "[t]heir efforts to affirmatively conceal the sender and recipient demonstrate their consciousness of guilt.

i.      On April 9, 2008, a call was intercepted between R.W. and Rahal.  R.W. told Rahal that R.W.'s accountant told him that R.W. was approximately $20,000 short on his tax obligation.  Rahal told R.W., "the most important thing is you get your taxes . . . paid.  I have that money. You don't. So I'll take care of that and then we'll work through it on, you know, down the road, etc."  On April 10, 2008, Rahal told R.W., "if we send you a check for this then we'll have to deduct it out of your commissions as we move forward." Rahal then told R.W. that he (Rahal) would send him $24,000.

45.     Special Agent Artley's declaration also sets forth specific evidence, provided by aforementioned Witness #1 and other current or former employees of SK, regarding bribes that Rahal, on behalf of SK, paid to individuals responsible for purchases for Safeway, Inc.  The declaration reports that:

a.      On April 22, 2008, an individual identified as "M.C.", the individual at Safeway with whom Rahal dealt on behalf of SK during the relevant time period, admitted to accepting payments from Rahal relating to the purchase of products by Safeway from SK.  Before M.C. left Safeway in September 2007, a copy of a business card for M.C. stated that M.C. was the "Group Manager, Strategic Sourcing" at Safeway.

b.      Agents reviewed bank records for Intramark and found an Intramark check for $1,000 payable to Randall Rahal on July 13, 2005.  In the memo section of the check is written, "Brokerage-[M.C.]." The check appears to be signed by Rahal.

c.      Bank records for Intramark show that another Intramark check for $1,000 was paid to Randall Rahal on December 5, 2005. In the memo section of the check is written, "Brokerage [M.C.]."

d.      On June 6, 2007, on an intercepted call, Rahal talked to Salyer about meeting with M.C. for lunch. Rahal told Salyer, "He [M.C.] don't give a s--- about lunch, you know what he cares about." Agents later intercepted a call

1       in which Rahal called M.C. and asked him if he wanted to meet for lunch.

2       M.C. told Rahal it was up to him. Rahal then told M.C. he had wanted to be

3       able to bring M.C. something but had not gone to the bank. Rahal told M.C.

4       that he would meet with him the next time he was in town.

5       e.    On July 19, 2007 agents conducted surveillance at the Walnut Creek BART

6       station. At approximately 5:00. p.m., Rahal exited the Walnut Creek BART

7       station, purchased a hot dog in the parking lot, and waited at the front of the

8       station. At approximately 5:15 p.m., Rahal entered a vehicle registered to

9       M.C. and driven by an individual matching the DMV photo of M.C., the

10      purchasing manager for Safeway. M.C. drove to a parking lot and stayed

11      there for 15 minutes. He then dropped Rahal back off at BART and M.C.

12      went home.

13     46.    Special Agent Artley's declaration also states that FBI agents intercepted a series of

14 phone calls between Rahal and another SK employee, identified as "J.B.," and between Rahal and

15 Salyer, the CEO of SK.  During these phone calls, Rahal, J.B., and Salyer discussed the possibility

16 of paying a bribe to the purchasing managers of another large company ("Purchaser #1").  Special

17 Agent Artley's declaration sets forth that following statements were made during those calls:

18      a.    J.B. asked Rahal, "What happens if you put him on the program?" Rahal

19      replied, "I can do it, we can get that [Company's] business." Rahal then told

20      J.B. that they would have to meet with Purchaser #1.  J.B. stated he would

21      "try to get something going with Purchaser #1" by setting up a meeting

22      between Rahal, J.B. and Purchaser #1.  Rahal told J.B., "he's [Purchaser #1]

23      a survivor and he knows how to play this game . . . you know a thousand

24      dollars in his pocket for every million pounds, that turns out to be, you

25      know that's ten grand on ten million pounds."

26      b.    In a later call, Salyer and Rahal discussed Purchaser #1.  Rahal stated,

27      "Purchaser #1's gonna need a retirement program. So, it's a perfect fit for

28      me." Salyer asked Rahal, "how fast are you going to reel in that fish?"

Rahal replied, "probably by the time the coffee comes that'll be done."

Salyer stated, "I want that sucker on speed reel. You know that big electric reel. Whew . . ." Based on monitored conversations, the FBI concluded that Rahal, J.B. and. Purchaser #1 did not meet at that time due to a scheduling conflict.

47.    Special Agent Artley's declaration describes another intercepted call between Rahal and Salyer, during which the two discussed a purchasing manager from another, different large company (Purchaser #2).  Rahal told Salyer that he might hire Purchaser #2 to work for SK at some point in the future.  Rahal told Salyer, "I'm just not ready to bring [Purchaser #2] here, first of all, [Purchaser #2] is a f---ing crook. Second of all, I need him where he is right now."  Salyer replied, "crooks are handy on the inside." Rahal responded, "as long as they're your crooks. Remember that, they gotta be your crooks. We've gotta few, I've gotta list." Salyer stated, "yeah, they're the only ones I like. Our crooks."

48.    According to Special Agent Artley's declaration, FBI agents intercepted a call on July 11, 2007, in which Rahal told J.B., "I wrote checks today almost $65,000, end of June, going into third quarter." Rahal added, "between [R.W.-Kraft], [J.W.-Frito-Lay], I had lunch with [R.T.-B & G Foods], he had a big chunk . . . we got another 500,000 pounds out of [J.D.-Agusa], so he'll get a thousand bucks that I'll bring with me, over at Agusa, [T.M.] got another order from him for 500,000 pounds and [M.C.-Safeway], I'm gonna see him in Walnut Creek on Thursday." Based upon the history of the investigation, the prior calls, and the context of the calls,  Special Agent Artley understood Rahal to be saying that he had already written bribe checks to several buyers and would be coming to California the following week to make additional payments to M.C. at Safeway and J.D. at Agusa.

49.    Rahal and Intramark's payments to the purchasing agents of SK customers were made with the knowledge and at the direction of SK and its owners, leaders, employees and associates.

50.    Bank records indicate that Rahal bribed the purchasing agents on behalf of SK. According to Special Agent Artley's declaration, SK made payments to Intramark for the sales of

SK products to the companies whose accounts were overseen by Rahal.  During this period, there were approximately 20 deposits totaling $3,221,341.74 into Intramark's Sun National Money Market Account; approximately 75% of those deposits ($2,468,617.79) consisted of checks drawn or wire transfers made on SK's corporate checking accounts at Harris Central Bank, N.A.  For example, Special Agent Artley's investigation revealed that, each year in January, SK transferred $600,000 by wire or check to Intramark as a prepayment for commissions.  Rahal's bookkeeper informed Special Agent Artley that commissions were earned by Intramark from SK, as SK products are shipped to accounts overseen by Intramark.  Special Agent Artley concluded that on January 11, 2008, SK wired $600,000 from its Harris Central Bank account to the Sun National Money Market Account for the purpose of promoting the carrying on of the underlying bribery and kickback scheme.

51.     The bribes had the specific purpose and were intended to ensure that customers purchased processed tomato products from SK rather than from competitors.  These bribes also helped SK circumvent the customer bidding process.  By providing kickbacks to purchasing agents, Defendants SK, Intramark, and Rahal hoped to ensure that insiders at customer companies provided SK with information about competitors' bidding information.

52.     By ensuring that customers bought processed tomato products from SK and not SK's competitors, SK, Intramark, and Rahal intended to ensure that SK's customers paid an inflated price for these products.   This allowed SK to garner supracompetitive profits and a greater share of the processed tomato products market than SK would have been garnered absent the conduct described herein.

53.     Defendants Rahal and Intramark also benefited from this bribery scheme.  Special Agent Artley reviewed Intramark's tax returns and tax transcripts for the years 2004 and 2006. During each period, Intramark showed a profit from its business.  As it appears that the majority of the deposits made in the Intramark account are from SK, Special Agent Artley found reason to believe that the majority of the net profit of Intramark is related to SK.

54.     Through the use of the bribes, Defendants SK, Intramark, and Rahal sought to induce the purchasing agents of SK's processed tomato product customers to act in their own

personal interest rather than in the interest of their employers.  Defendants, SK, Intramark, and Rahal thereby deprived the customer-companies of the honest services of their own employees.

55.     SK, Intramark and Rahal also knowingly and routinely directed the sale of processed tomato products to SK customers that did not meet the specifications outlined in those customers' contracts.  To conceal the fact that products were not compliant with the contractual requirements, SK, Intramark and Rahal, together with unnamed co-conspirators, knowingly and routinely falsified or directed the falsification of internal documents, customer-bound product labels, invoices, bills of lading, and Certificates of Analysis ("COA"), in order to make it appear as if the quality and content of the processed tomato products shipped to customers satisfied contractual requirements.

56.     In a press release issued by the United States Attorney for the Eastern District of California in Sacramento on December 10, 2008, Acting Assistant Attorney General Deborah A. Garza stated that the conduct that is the subject of the Information "deprived the purchasers of processed tomato products of the benefits of a competitive marketplace, ultimately causing American consumers to pay higher prices for these everyday staples."

**The Processed Tomato Products Price-Fixing Conspiracy**

57.     Since at least as early as 2006, Defendants SK, Ingomar and LG – all leading producers of processed tomato products – conspired together and with unnamed co-conspirators to fix prices for their processed tomato products at supra-competitive levels.  In 2006, SK, Ingomar and LG joined together to form the California Tomato Export Group. This entity was established for the purported purpose of selling tomato paste, sauce, and other tomato products overseas, but upon information and belief became a vehicle for communication on pricing among Defendants SK, Ingomar and LG.  These Defendants disbanded the California Tomato Export Group following FBI raids in May 2008 of several tomato processors.

58.     On September 24, 2008, the San Francisco Chronicle reported that "Federal investigators confirmed Tuesday that they were looking into the possibility that California tomato processors had engaged in price-fixing schemes."  According to the San Francisco Chronicle report, "[a] lawyer for one major processor, SK Foods of Lemoore (Kings County), said the

1   government had sought information about price-fixing at the same time FBI and Internal Revenue

2   Service agents served a series of search warrants in the Central Valley in April and seized millions

3   of pages of documents from tomato processors." Also according to the San Francisco Chronicle

4   story, "Brian Maschler, an attorney for SK Foods, said investigators were also interested in a

5   partnership the company formed in 2006 with Ingomar Packing of Los Banos (Merced County)

6   and Los Gatos Tomato Products of Huron (Fresno County)."

7          59.    The Wall Street Journal reported on September 23, 2008 that "In the tomato-

8   industry probe, a federal grand jury in Sacramento, Calif., has issued subpoenas, and Federal

9   Bureau of Investigation agents are interviewing executives of big California tomato processors,

10   lawyers close to the case said. The officials are trying to determine if dominant processors of

11   tomatoes for canning, ketchup, salsa and sauces conspired to fix prices, these people said."

12          60.    As reported in the September 23, 2008 Wall Street Journal article, tomatoes were

13   "among the big price gainers in the past year, notwithstanding this summer's scare – false, it turned

14   out – that fresh tomatoes could be tainted with salmonella. Tomato prices rose 16% in the year

15   ending in August [2008], while food prices overall rose about 6%, according to the Bureau of

16   Labor Statistics."

17          61.    Upon information and belief, the conspiracy among Defendants SK, Ingomar and

18   LG and other unnamed co-conspirators operated to fix the prices of processed tomato products

19   sold by these companies and other unnamed co-conspirators at artificially high, supracompetitive

20   prices.

21                                           **COUNT I**

22                          **Violation Of Section 1 Of The Sherman**
                            **Act And Section 4 Of The Clayton Act)**
23          **(Against Defendants SK, Intramark, and Rahal and Unnamed Co-Conspirators)**

24          62.    Plaintiff incorporates by reference the allegations in all of the foregoing paragraphs

25   as if they were fully set forth herein.

26          63.    Beginning at least as early as February 2006, Defendants SK, Intramark, Rahal and

27   unnamed co-conspirators entered into and engaged in a contract, combination or conspiracy to

28   suppress and restrain competition for processed tomato products in the United States, in

-20-

unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.  Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

64.     The contract, combination or conspiracy consisted of an agreement, understanding or concerted action between and among Defendants SK, Intramark, Rahal, and unnamed co-conspirators, the substantial terms of which were:

        a.     To allocate among the Defendants and conspirators contracts for the sale of processed tomato products;

        b.     To fix prices for, and submit collusive, noncompetitive, and rigged bids for contracts for the sale of processed tomato products; and

        c.     To provide product and receive payment from customers as a result of the allocation and collusive bidding.

65.     For the purpose of forming and carrying out the charged contract, combination or conspiracy, Defendants SK, Intramark, Rahal, and unnamed co-conspirators did those things they conspired to do, including, among other things:

        a.     Participating in meetings, conversations, and communications to discuss the prices of processed tomato products;

        b.     Agreeing, during those meetings, conversation and communications, to fix prices of processed tomato products to charge to customers located in the United States; and

        c.     Issuing price quotations in accordance with the agreements reached.

66.     Defendants SK, Intramark, Rahal, and unnamed co-conspirators' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.  This unlawful conduct was through mutual understandings or agreements by, between and among Defendants SK, Intramark, Rahal and unnamed co-conspirators.

67.     The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

CLASS ACTION COMPLAINT

a.   Price competition in the sale of processed tomato products in the United States has been restrained, suppressed, or eliminated;

b.   Prices for processed tomato products sold in the United States have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels;

c.   Plaintiff and Class Members have been deprived of the benefits of free, open and unrestricted competition in the market for processed tomato products; and

d.   Direct purchasers of processed tomato products have been deprived of the benefits of free and open competition in establishing the prices paid in the United States for processed tomato products.

68.   By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property in that they paid supracompetitive prices for processed tomato products as a result of the contract, combination or conspiracy among Defendants SK, Intramark, Rahal and unnamed co-conspirators to fix prices and restraint trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

**COUNT II**

**Violation Of Section 1 Of The Sherman
Act And Section 4 Of The Clayton Act)
(Against Defendants SK, Ingomar, LG, and Unnamed Co-Conspirators)**

69.   Plaintiff incorporates by reference the allegations in all of the foregoing paragraphs as if they were fully set forth herein.

70.   Beginning at least as early as February 2006, Defendants SK, Ingomar, LG, and unnamed co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

71.   The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants SK, Ingomar, LG, and unnamed co-conspirators

in furtherance of which SK, Ingomar, LG, and unnamed co-conspirators raised, fixed, maintained, pegged, and/or stabilized prices for processed tomato products. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

72.     Defendants SK, Ingomar, LG, and unnamed co-conspirators' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. This unlawful conduct was through mutual understandings or agreements by, between and among Defendants SK, Ingomar, LG, and unnamed co-conspirators.

73.     The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

     a.     Price competition in the sale of processed tomato products in the United States has been restrained, suppressed, or eliminated;

     b.     Prices for processed tomato products sold in the United States have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels;

     c.     Plaintiff and Class Members have been deprived of the benefits of free, open and unrestricted competition in the market for processed tomato products; and

     d.     Direct purchasers of processed tomato products have been deprived of the benefits of free and open competition in establishing the prices paid in the United States for processed tomato products.

74.     By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property in that they paid supracompetitive prices for processed tomato products as a result of the contract, combination or conspiracy among Defendants SK, Ingomar, LG, and unnamed co-conspirators to fix prices and restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

# COUNT III

### Violation of 18 U.S.C. § 1962(c)
### (Against Defendants SK, Intramark, Rahal and Unnamed Co-Conspirators)

75.     Plaintiff incorporates by reference the allegations in all of the foregoing paragraphs as if they were fully set forth herein.

76.     Defendants SK, Intramark, Rahal, and unnamed co-conspirators are all persons within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

77.     Defendant SK, including its leaders, employees and associates, constitutes an "enterprise" as within the meaning of 18 U.S.C. § 1961(4) (hereinafter "the enterprise").

78.     During the relevant time period, Defendant Intramark was owned and operated by Defendant Rahal.  Through Intramark, Rahal worked on behalf of SK as a sales broker.  In that capacity, Rahal oversaw among other things the negotiation and execution of contracts between SK and many of its customer companies.  Through Intramark, Rahal also acted as an advisor and director of SK, giving direction to and receiving periodic reports regarding various aspects of SK's business from SK employees, including certain unnamed co-conspirators.

79.     Rahal, SK, Intramark and other unnamed conspirators were leaders, employees, and associates of the enterprise.

80.     Beginning at least as early as January, 2004, Defendants SK, Intramark, Rahal, and unnamed co-conspirators have conducted the affairs of the enterprise through a pattern of racketeering activity, causing significant harm to the Plaintiff and Class Members.

81.     The purposes of Defendants SK, Intramark, Rahal, and other unnamed co-conspirators, who were all leaders, employees and associates of the enterprise included the following:

        a.     Providing SK and its leaders, employees and associates with an expanding base of corporate customers for processed tomato products;

        b.     Preserving SK's profits and customer base through acts of mail fraud, wire fraud, and bribery;

c.    Causing the purchasing agents and others employed by SK's customers to act in contravention of the customers' interests, and depriving the customers of their rights to their employees' honest services;

d.    Promoting and enhancing the enterprise and its leaders, employees and associates' activities;

e.    Enriching the leaders, employees, and associates of the enterprise; and

f.    Concealing and otherwise protecting the conspiracy and its participants from detection and prosecution.

82.    As detailed above, Defendants SK, Intramark, Rahal, and other leaders, employees, and associates of the enterprise, conducted and participated in the conduct and affairs of the enterprise through the following means and methods, among others:

a.    Defendants SK, Intramark, Rahal and other leaders, employees and associations of the enterprise engaged in a scheme to defraud and deprive various SK customers of their respective rights to the honest services of certain of their own employees through acts involving bribery, which were intended to: (1) ensure that those customers purchased processed tomato products and other products from SK rather than from its competitors; (2) ensure those customers paid an inflated price for such products; and (2) induce the purchasing agents to disclose bidding and other proprietary information of certain of SK's competitors.

b.    Bribery payments to the purchasing agents of SK's customers were made with the knowledge and at direction of SK's owners, leaders, employees and associates.

c.    Defendant Rahal, assisted by other leaders, employees and associates of the enterprise bribed SK's customers to do business with, and release funds to the enterprise.

d.    Defendant Rahal, assisted by other leaders, employees and associates of the enterprise, knowingly and routinely directed the sale of processed tomato

products to SK's customers that did not meet the specifications outlines in those consumers' contracts.  In order to conceal the fact that the product was noncompliant, and to induce customers to do business with and release funds to the enterprise, Rahal, assisted by other leaders, employees and associates of the enterprise knowingly and routinely directed the falsification of other internal documentation, and customer-bound product labels, invoices, bills of lading, and Certificates of Analysis ("COA"), in order to make it appear as if the quality and content of the processed tomato products shipped to customers satisfied contractual requirements.

83.     Defendants SK, Intramark, Rahal, and other unnamed co-conspirators, have conducted and participated in the affairs of the enterprise, through a pattern of racketeering activity that includes predicate acts indictable under the following provisions of federal law: 18 U.S.C. § 1341 and 1346 (honest services mail fraud); 18 U.S.C. § 1343 (wire fraud), and multiple acts of bribery chargeable under the following provisions of state law: N.J. Stat. Ann. § 2:21-10 (2008); Cal Pen. Code § 641.3 (2008); and Tex. Penal Code § 32.43 (2008).

84.     The pattern of racketeering activity consisted of separate and distinct violations of the federal mail fraud statute (18 U.S.C. §§ 1341, 1346), the federal wire fraud statute (18 U.S.C. § 1343), and the state law bribery provisions (N.J. Stat. Ann. § 2:21-10 (2008); Cal Pen. Code § 641.3 (2008); and Tex. Penal Code § 32.43 (2008)).   These predicate acts, examples of which are specified in paragraphs 33-56 of this Complaint, involved the mailing of bribes to purchasing agents for SK's company customers and the wire transfer of related commissions from SK to Intramark.  Each of these predicate acts constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).  Collectively, these violations are a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

85.     The predicate acts committed by Defendants SK, Intramark, and Rahal and directly set forth in this Complaint were related, were continuous and systematic, had the same or similar purpose of executing these schemes and unlawful conduct alleged herein, involved the same or

1  similar participants and method of commission, had similar results, multiple victims, and directly
2  impacted the Plaintiff and Class Members.

3          86.     Plaintiff and Class Members have been injured in their business and property by
4  reason of these violations in that they have they paid more for processed tomato products than
5  they would have paid had Defendants SK, Intramark, Rahal, and other unnamed co-conspirators
6  not engaged in the pattern of racketeering activity.

7          87.     Plaintiff and Class Members' injuries to their business and property were directly
8  and proximately caused by the racketeering activity of Defendants SK, Intramark, Rahal, and other
9  unnamed co-conspirators.

10         88.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and
11  severally liable to the Plaintiff and Class Members for three times the damages Plaintiff and Class
12  Members have sustained, plus the costs of this suit, including reasonable attorneys' fees.

13                                        **COUNT IV**

14                          **Violation of 18 U.S.C. § 1962(d)**
    **(Against Defendants SK, Intramark, and Rahal and Unnamed Co-Conspirators)**
15

16         89.     Plaintiff incorporates by reference the allegations in all of the foregoing paragraphs
17  as if they were fully set forth herein.

18         90.     18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire
19  to violate any of the provisions of subsection (a), (b), or (c) of this section."

20         91.     Defendants SK, Intramark, Rahal, and other unnamed co-conspirators, have
21  violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).  The object of this
22  conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the
23  affairs of the enterprise, described previously in Count III, through a pattern of racketeering
24  activity.  Defendants SK, Intramark, Rahal, and other unnamed co-conspirators, agreed to join the
25  conspiracy, agreed to commit, and did commit, predicate acts described in this Complaint, and
26  knew these acts were part of a pattern of racketeering activity.

27         92.     As set forth in detail above, Defendants SK, Intramark, Rahal, and other unnamed
28  co-conspirators have engaged in numerous continuous and systematic overt and predicate

1    fraudulent racketeering acts in furtherance of the conspiracy, including among other things the

2    bribery of purchasing agents to ensure that customers purchased tomato products from SK rather

3    than from competitors.

4         93.    It was a further part of the conspiracy that SK, Intramark, Rahal and the unnamed

5    co-conspirators agreed that a conspirator would commit at least two acts of racketeering activity in

6    the conduct of the affairs of the enterprise.

7         94.    The nature of the above-described acts in furtherance of the conspiracy gives rise to

8    the inference that SK, Intramark, Rahal and the unnamed co-conspirators not only agreed to the

9    objective of violation 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), but that

10   they were aware that their ongoing actions have been and are part of an overall pattern of

11   racketeering activity.

12        95.    As a direct and proximate result of the overt acts and predicate acts of Defendants

13   SK, Intramark, and Rahal and unnamed co-conspirators in furtherance of the violation of 18

14   U.S.C. § 1962(d) through a conspiracy to violate 18 U.S.C. § 1962(c), Plaintiff and Class

15   Members have been and are continuing to be injured in their business or property.

16

17        WHEREFORE, Plaintiff prays for relief as follows:

18   (1)    That the Court determine that this action may be maintained as a class action under
            Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be
19          denominated as class representative, and that Plaintiffs' counsel be appointed as
            counsel for the Class;
20
     (2)    That the unlawful contract, combination and conspiracy alleged against Defendants
21          SK, Intramark, Rahal, and unnamed co-conspirators in Count I be adjudged and
            decreed to be an unreasonable restraint of trade or commerce in violation of Section
22          1 of the Sherman Act;

23   (3)    That the unlawful contract, combination and conspiracy alleged against Defendants
            SK, Ingomar, LG, and unnamed co-conspirators in Count II be adjudged and
24          decreed to be an unreasonable restraint of trade or commerce in violation of Section
            1 of the Sherman Act;
25
     (4)    That Plaintiff and the Class recover compensatory damages, as provided by law,
26          determined to have been sustained as to each of them for Defendants' violations of
            Section 1 of the Sherman Act; that plaintiffs be awarded treble these damages, as
27          provided by law; and that judgment be entered against Defendants on behalf of
            Plaintiff and each and every member of the Class;
28

(5)     That for Defendants' violations giving rise to relief pursuant to 18 U.S.C. § 1962 *et seq.*, that Plaintiff and Class Members recover three times the damages sustained as a result of Defendants' conduct, and attorneys' fees and costs of suit, such amounts to be determined at trial;

(6)     That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(7)     That Plaintiff and the Class recover their costs of this suit, including attorneys' fees, as provided by law; and

(8)     For such further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  December 12, 2008

Of Counsel:

Stephen R. Neuwirth
Sami Rashid
QUINN EMANUEL URQUHART  OLIVER
    & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000
(212) 849-7100 (fax)
stephenneuwirth@quinnemanuel.com

Robert P. Feldman (Cal. Bar # 69602)
QUINN EMANUEL URQUHART OLIVER
    & HEDGES, LLP
555 Twin Dolphin Dr. Suite 560
Redwood Shores, California  94065
(650) 801-5000
(650) 801-5100 (fax)
robertfeldman@quinnemanuel.com

By:

/s/ J. D. Horton_____
John B. Quinn (Cal. Bar # 090378)
A. William Urquhart (Cal. Bar # 140996)
J. D. Horton (Cal. Bar # 192836)
QUINN EMANUEL URQUHART OLIVER
    & HEDGES, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California  90017
(213) 443-3000
(213) 443-3100 (fax)
jdhorton@quinnemanuel.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT

1

2   Of Counsel:                                          Of Counsel:

3   Stanley D. Bernstein                                 James E. Cecchi
    Ronald J. Aranoff                                    Lindsey H. Taylor
4   BERNSTEIN LIEBHARD LLP                               CARELLA, BYRNE, BAIN, GILFILLAN,
    10 East 40th Street, 29th Floor                          CECCHI, STEWART & OLSTEIN
5   New York, New York 10016                             5 Becker Farm Rd.
    (212) 779-1414                                        Roseland, New Jersey 07068
6   (212) 779-3218 (fax)                                 (973) 994-1700
    aranoff@bernlieb.com                                 jcecchi@carellabyrne.com
7

8
    Stephen A. Weiss
9   SEEGER WEISS LLP
    1 William Street
10  New York, New York  10004
    (212) 584-0700
11  sweiss@seegerweiss.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28