IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT COURT OF CALIFORNIA

FOUR IN ONE COMPANY, INC., et al.,

                Plaintiffs,               No. 2:08-cv-3017 KJM EFB

     vs.

S.K. FOODS, L.P., et al.,

                Defendants.          <u>ORDER</u>

_____/

        The court heard argument on plaintiffs' motion for an order preliminarily approving a class settlement and provisionally certifying the settlement class on November 15, 2013.  Steig Olson of Quinn Emanuel Urquhart & Sullivan LLP and Arthur Bailey of Hausfeld LLP appeared for plaintiffs; George Nicoud and Steve Zovickian appeared for defendants.  After carefully considering the parties' submission and the applicable law, the court GRANTS plaintiffs' motion for the reasons set forth below.

I.   <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

        This case arises from defendants' alleged conspiracy to raise and fix the prices of tomato paste, tomato sauce, and diced tomatoes ("processed tomato products").  Plaintiffs are food products manufacturers that purchased processed tomato products from defendants.  (Consolidated

1    Class Action Compl. ("Compl.") 1:21–2:17, ECF No. 113.)  In essence, plaintiffs allege they were

2    overcharged for processed tomato products as a result of defendants' anticompetitive conduct.  (*Id.* at

3    2:8–17 ("Plaintiffs and members of the Class have each paid a higher price for Processed Tomato

4    Products than they would have paid absent the concerted unlawful activity alleged herein.  Through this

5    course of illegal conduct, Defendants substantially increased their profits.").)  Plaintiffs assert

6    defendants thereby violated federal antitrust laws and brought five separate actions in 2008 and 2009

7    that were consolidated together in 2009: (1) *Four in One Co., Inc. v. SK Foods, L.P., et al.*, No. 2:08-cv-

8    3017; (2) *Diversified Food & Seasonings, Inc. v. SK Foods, L.P.*, No. 2:08-cv-3074; (3) *Bruce Foods*

9    *Corp. v. SK Foods, L.P., et al.*, No. 2:09-cv-0027; (4) *L'Ottavo Ristorante, et. al. v. Ingomar Packing*

10   *Co., et al.*, No. 2:09-cv-1945; and (5) *Cliffstar Corp. v. SK Foods, L.P., et al.*, No. 2:09-cv-0442.  (ECF

11   No. 88.)

12              The facts giving rise to these consolidated actions have also led to the criminal

13   prosecution of defendants Scott Salyer, Randall Rahal, and SK Foods by the United States in separate

14   criminal proceedings, *United States v. Rahal*,  No. 2:08-cr-0566 (E.D. Cal.).  According to plaintiffs'

15   counsel's representation at the hearing, defendant Scott Salyer was "the ringleader of the conspiracy and

16   really the most culpable party," and he was sentenced to 72 months in prison earlier this year.[1]

17   (Defendants Salyer, Rahal, and SK Foods are not part of the proposed settlement agreements currently

18   before the court.)

19              In light of the related criminal proceedings, the United States intervened in these

20   consolidated actions in 2009 for a limited stay of discovery, and the court granted the United States'

21   motion and stayed discovery.  (ECF No. 186.)  Accordingly, no depositions have been taken; however,

22   the parties have been permitted to conduct, and have conducted, "document discovery."  (*Id.* at 2:14–

23   26.)

24              Moreover, and importantly for decision on the pending motion, defendants Gregg Pruett

25   and Ingomar Packing Company were accepted into the U.S. Department of Justice's amnesty program

26

27              [1] This order relies in part on the representations of counsel at the hearing on November
     15, 2013.  *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632 (2004) ("[The] preliminary
28   fairness evaluation . . . . can be made on the basis of . . . informal presentation by parties.").  The
     hearing transcript is on file with the Clerk of the Court and available on request.

for their cooperation in the criminal investigation under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), Pub. L. No. 108-237, 118 Stat. 661 (codified as amended at 15 U.S.C. § 1 Note) (limiting civil recovery to "actual damages"—precluding treble damages and joint and several liability—for "cooperating individuals").  Accordingly, plaintiffs may not be able to recover treble damages from these defendants or hold these defendants jointly and severally liable if these defendants continue to be deemed "cooperating individuals" under ACPERA.

Despite these complications, plaintiffs' counsel stated at the hearing that plaintiffs may yet be able to recover from defendant Salyer, separately from the proposed class settlements currently before this court, through ongoing bankruptcy and criminal restitution proceedings not before this court. Specifically, plaintiffs' counsel said that "the bankruptcy court has certified the class and ordered that [plaintiffs are] entitled up to $70 million of an unsecured claim. . . .  And there is litigation particularly pending in Australia" through which plaintiffs' counsel hopes "up to $50 or $60 million will be obtainable" from defendant Salyer.[2]

According to plaintiffs' counsel, the government's ongoing criminal investigation and the related criminal proceedings assisted plaintiffs' counsel with their investigation of plaintiffs' antitrust claims, and defendants' possible defenses, before plaintiffs' counsel entered into settlement negotiations and pursued mediation with the settling defendants.[3]  In particular, plaintiffs' counsel at the hearing cited the criminal proceedings concerning defendant Salyer: "[The] proceedings [involving defendant Salyer] resulted in extensive FBI witness interview notes being produced in a public fashion which gave us really a large amount of detail of the day-to-day facts underlying the case.  And we explored those in great detail."  Moreover, plaintiffs' counsels' investigation was aided by information provided by a cooperating defendant.

In 2013, plaintiffs and defendants Ingomar Packing Company, Greg Pruett, Los Gatos Tomato Products, and Stuart Wolff ("settling defendants") began to negotiate a class settlement.  These negotiations "occurred over a span of many months and involved telephonic and face to face meetings and e-mail communications."  (Decl. of Arthur N. Bailey, Jr. ¶ 9, ECF No. 208.)  "On April 29, 2013, an

---

[2] *See supra* note 1.
[3] *See supra* note 1.

3

1    11 hour joint mediation session, which was mediated by Judge Layn Phillips, was held . . . at which

2    agreements in principle on the settlements were reached." (*Id.*) Plaintiffs' counsel declares the

3    settlement was the result of "arms-length" negotiations in which "Plaintiffs' Co-Lead Counsel zealously

4    advanced Plaintiffs' positions and were fully prepared to continue to litigate rather than to accept a

5    settlement that was not in the best interests of the Class." (*Id.*) Further, plaintiffs' counsel declares: "It

6    is my opinion that the . . . Settlements are, in every aspect, fair, adequate and reasonable and in the best

7    interest of the class members. My opinion is based on my extensive experience in class action antitrust

8    cases." (*Id.* ¶ 12.) At the hearing, plaintiffs' counsel modestly represented that both proposed class

9    counsel law firms, Quinn Emanuel and Hausfeld LLP, "are two of the probably premier firms in the

10   country that do these types of cases," and, more matter-of-factly, "have both taken these kinds of cases

11   to trial."[4]

12   II.  <u>STANDARDS AND PROCESS FOR CLASS SETTLEMENT APPROVAL</u>

13                "Courts have long recognized that settlement class actions present unique due process

14   concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig.* (*Bluetooth*), 654 F.3d

15   935, 946 (9th Cir. 2011) (internal quotation marks omitted). To protect absent class members' due

16   process rights, Rule 23(e) of the Federal Rules of Civil Procedure permits a class action to be settled

17   "only with the court's approval" "after a hearing and on a finding" that the agreement is "fair,

18   reasonable, and adequate." Moreover, if "the settlement agreement is negotiated prior to formal class

19   certification," then "there is an even greater potential for a breach of fiduciary duty owed the class."

20   *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157, 1168 (9th Cir. 2013) (alteration and internal

21   quotation marks omitted) (quoting *Bluetooth*, 654 F.3d at 946). "Accordingly, such agreements must

22   withstand an even higher level of scrutiny for evidence of collusion or other conflicts than is ordinarily

23   required under Rule 23(e) before securing the court's approval as fair." *Bluetooth*, 654 F.3d at 946.

24   "Judicial review must be exacting and thorough." MANUAL FOR COMPLEX LITIGATION (FOURTH)

25   § 21.61 (2004).

26                "Review of a proposed class action settlement usually involves two hearings." *Id.*

27   § 21.632. First, the parties submit the proposed terms of the settlement so that the court can make "a

28

─────────────────

[4] *See supra* note 1.

4

preliminary fairness evaluation," and if the parties move "for both class certification and settlement approval, the certification hearing and preliminary fairness evaluation can usually be combined." *Id.* Then, "[t]he judge must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and the date of the final fairness hearing." *Id.* After the initial certification and notice to the class, the court then conducts a second fairness hearing before finally approving any proposed settlement. *Narouz v. Charter Commc'ns, Inc.*, 591 F.3d 1261, 1266–67 (9th Cir. 2010).

Regarding class certification, the parties' stipulation that the class should be certified is not sufficient; instead the court "must pay undiluted, even heightened attention to class certification requirements." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (internal quotations marks omitted). *But see* 4 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 11:28 "Rule 23 requirements more readily satisfied for settlement classes" (4th ed. 2002) ("Since *Amchem*, approval of settlement classes is generally routine and courts are fairly forgiving of problems that might hinder class certification were the case not to be settled." (collecting cases)). Regarding notice to the class, the court must ensure that the class members "receive 'the best notice that is practicable under the circumstances.'" *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S.Ct. 2541, 2558 (2011) (quoting FED. R. CIV. P. 23(c)(2)(B)).

III. <u>ANALYSIS</u>

A.   <u>Class Certification</u>

A party seeking to certify a class must demonstrate that it has met the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Amchem*, 521 U.S. at 614; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). Although the parties in this case have stipulated that a class exists for purposes of settlement, the court must nevertheless undertake the Rule 23 inquiry independently, both at this stage and at the later fairness hearing. *West v. Circle K Stores*, No. 2:04-cv-0438 WBS GGH, 2006 WL 1652598, at *2 (E.D. Cal. June 12, 2006).

Under Rule 23(a), before certifying a class, this court must be satisfied that:

(1) the class is so numerous that joinder of all members is impracticable
(the "numerosity" requirement);

(2) there are questions of law or fact common to the class (the "commonality" requirement);

(3) the claims or defenses of representative parties are typical of the claims or defenses of the class (the "typicality" requirement); and

(4) the representative parties will fairly and adequately protect the interests of the class (the "adequacy of representation" inquiry).

*Collins v. Cargill Meat Solutions Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011) (quoting *In re Intel Sec. Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981)); *accord* FED. R. CIV. P. 23(a).

The court must also determine whether the proposed class satisfies Rule 23(b)(3), on which plaintiffs rely, in this case. To meet the requirements of this subdivision of the rule, the court must find that "'questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and effectively adjudicating the controversy." *Dukes*, 131 S. Ct. at 2558 (quoting FED. R. CIV. P. 23(b)(3)). "The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; [and] (B) the extent and nature of any litigation concerning the controversy already begun by or against class members . . . ." FED. R. CIV. P. 23(b)(3)(A)–(B).

1.      Numerosity

Although there is no absolute numerical threshold for numerosity, courts have approved classes consisting of thirty-nine, sixty-four, and seventy-one plaintiffs. *Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citing *Jordan v. L.A. Cnty.*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810). Plaintiffs estimate the potential plaintiffs in this class action include "hundreds of members dispersed across the country who directly purchased Processed Tomato Products from the . . . Defendants and their co-conspirators from February 1, 2005 to December 31, 2008." (Mem. P. & A. in Support of Pl.'s Mot. ("Mot.") 16:24–17:1 (citing Bailey Decl. ¶ 10).) Accordingly, the numerosity requirement has been met.

2.      Commonality

To satisfy the commonality requirement, plaintiffs must do more than show "that they have all suffered a violation of the same provision of law." *Dukes*, 131 S. Ct. at 2551. The claims must depend upon a common contention that "must be of such a nature that it is capable of classwide

6

1   resolution—which means that determination of its truth or falsity will resolve an issue that is central to

2   the validity of each one of those claims in one stroke." *Id.* It is not so much that the class raises

3   common questions: what is necessary is "the capacity of a classwide proceeding to generate common

4   answers . . . ." *Id.* "[T]he merits of the class members' substantive claims are often highly relevant

5   when determining whether to certify a class." *Ellis*, 657 F.3d at 981.

6           Here, given the nature of the class claims and definition of the class, it appears the

7   commonality requirement has been satisfied. Not only does the class raise common questions, but the

8   class action may generate a class-wide answer to the central issue: the existence and effect or not of an

9   alleged conspiracy to raise and fix prices on processed tomato products. *See In re Dynamic Random*

10  *Access Memory (DRAM) Antitrust Litig.*, No. 4:02-md-1486 PJH, 2006 WL 1530166, at *3–4 (N.D.

11  Cal. June 5, 2006) ("[C]ourts have consistently held that 'the very nature of a conspiracy antitrust action

12  compels a finding that common questions of law and fact exist'" (quoting *In re Rubber Chem. Antitrust*

13  *Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005))). Thus, at this stage the court finds the commonality

14  requirement has been met.

15          3.      Typicality

16          "'[T]he commonality and typicality requirements of Rule 23(a) tend to merge'" because

17  both act "'as guideposts for determining whether maintenance of a class action is economical and

18  whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class

19  members will be fairly and adequately represented in their absence.'" *Dukes*, 131 S. Ct. at 2551 n.5

20  (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 n.13 (1982)). A court resolves the

21  typicality inquiry by considering "whether other members have the same or similar injury, whether the

22  action is based on conduct which is not unique to the named plaintiffs, and whether other class members

23  have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984 (citation and internal

24  quotation marks omitted); *Morales v. Stevco, Inc.*, No. 1:09-cv-00704 AWI-JLT, 2011 WL 5511767, at

25  *6 (E.D. Cal. Nov. 10, 2011). In this case, it appears the class members suffered the same injury when

26  they purchased processed tomato products from defendants and plaintiffs' claims and those of the class

27  members are based on the same legal theory. This satisfies the typicality inquiry. *See Murillo*, 266

28  F.R.D. at 575.

4.   Adequacy of Representation

To determine whether the named plaintiffs will protect the interests of the class, the court must explore two factors: (1) do the named plaintiffs and their counsel have any conflicts of interest with the class as a whole, and (2) have the named plaintiffs and counsel vigorously pursued the action on behalf of the class. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *see also Clersceri v. Beach City Investigation Servs., Inc.*, No. 10-cv-3873 JST (RZx), 2011 WL 320998, at *6 (C.D. Cal. Jan. 27, 2011) ("(1) the class representative must not have interests antagonistic to the unnamed class members, and (2) the representative must be able to prosecute the action 'vigorously through qualified counsel.'" (citation omitted)).

Nothing in the papers presently before the court suggests the representative plaintiffs have any conflicts of interest with the other class members.  Because their claims appear to be "completely aligned with [that] of the class," there is no conflict.  *Collins*, 274 F.R.D. at 301.

"Although there are no fixed standards by which 'vigor' can be assayed, considerations include competency of counsel and, in the context of a settlement-only class, an assessment of the rationale for not pursuing further litigation." *Hanlon*, 150 F.3d at 1021.  In addition, a named plaintiff will be deemed to be adequate "as long as the plaintiff has some basic knowledge of the lawsuit and is capable of making intelligent decisions based upon [the plaintiff's] lawyers' advice . . . ." *Kaplan v. Pomerantz*, 131 F.R.D. 118, 121–22 (N.D. Ill. 1990).

Plaintiffs' lead counsel has described his experience in antitrust law cases and specifically in antitrust class actions involving food products.  (Decl. Bailey ¶¶ 6, 12, ECF No. 208.)  At this early stage in the settlement-approval process, this is sufficient.  Counsel also has explained that they agreed to settlement only after "extensive arms-length negotiations," including an "11 hour joint mediation session, which was mediated by Judge Layn Phillips," at which the principal terms of the settlements were reached.  (*Id.* ¶ 9.)  This representation by counsel does not undercut a finding of vigor. At least at this stage of the settlement-approval process, plaintiffs are adequate class representatives. *See Falcon*, 457 U.S. at 160 (observing that finding of adequacy "particularly during the period before any notice is sent to members of the class 'is inherently tentative'").

///

8

1          5.      Predominance

2          "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are

3    sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  Although

4    this inquiry is similar to Rule 23(a)'s commonality requirement, it is more demanding. *Id.* at 624.  To

5    determine whether common questions predominate, the court must consider "the relationship between

6    the common and individual issues" by looking at the questions that preexist any settlement. *Hanlon*,

7    150 F.3d at 1022.  The Supreme Court has observed that the predominance test is "readily met" in cases

8    alleging "violations of antitrust laws." *Amchem*, 521 U.S. at 625.

9          In addition, the predominance inquiry focuses on the "notion that adjudication of

10   common issues will help achieve judicial economy." *In re Wells Fargo Home Mortg. Overtime Pay

11   Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) (citation and internal quotation marks omitted).

12         As noted above, with the major issues in this case stemming from an alleged

13   overarching conspiracy to raise and fix the prices of processed tomato products, a narrowly defined

14   class, and little suggestion there will be individual issues apart from the calculation of individualized

15   damages, the class action will promote efficiency by allowing a number of claims to be litigated

16   simultaneously.  Again, at this stage, the predominance requirement has been met.

17         6.      Superiority

18         In resolving the Rule 23(b)(3) superiority inquiry, the court should consider class

19   members' interests in pursuing separate actions individually, any litigation already in progress involving

20   the same controversy, the desirability of concentrating the litigation in one forum, and potential

21   difficulties in managing the class action, although the last two considerations are not relevant in the

22   settlement context. *Schiller v. David's Bridal, Inc.*, No. 1:10-cv-0616 AWI-SKO, 2012 WL 2117001, at

23   *10 (E.D. Cal. June 11, 2012) ("In the context of settlement, however, the third and fourth factors are

24   rendered moot and are not relevant . . . . because the point is that there will be no trial . . . ." (citing

25   *Amchem*, 521 U.S. at 620)).

26         Here, the court is not aware of any other litigation involving the same dispute over

27   pricing over the processed tomato products.  If each class member were to sue, each company would

28   bring essentially the same claim for a relatively small amount of money and yet might have to expend

9

significant individual costs to hire experts.  Thus, a class action is superior to individual resolution of the antitrust claims.

        B.      <u>Preliminary Fairness Determination</u>

              1.      <u>Proposed Settlement Agreements</u>

        The proposed settlement contains the following provisions.  Defendants Ingomar Packing Company ("Ingomar") and Greg Pruett agree to pay $3,500,000 for a complete release of all class members' antitrust claims against Ingomar, Pruett, and all current and former employees and agents, successors, and assigns of Ingomar, (Decl. Bailey, Ex. A ¶¶ 21–24, ECF No. 208-1); and defendants Los Gatos Tomato Products ("Los Gatos") and Stuart Wolf agree to pay $2,900,000 for a release of all class members' antitrust claims against Los Gatos, Wolf, and all current and former employees and agents, successors, and assigns of Los Gatos, (Decl. Bailey, Ex. B ¶¶ 21–24, ECF No. 208-2).  The funds will be deposited in one lump sum no later than January 3, 2014, into a Settlement Fund, and the funds will be held in escrow until the settlement agreements are finally approved to eventually be distributed to class members pro rata as approved by the court, as provided by a court order approving administration of claims and distribution of funds.  (Decl. Bailey, Ex. A ¶¶ 24–26; Decl. Bailey, Ex. B ¶¶ 24–26.)  Moreover, "until final judgment is entered in this Action against all Defendants, the sales of Processed Tomato Products by Pruett and Ingomar," as well as "Wolf and Los Gatos," (Decl. Bailey, Ex. B ¶ 40), "shall remain in the case against the Non-Settling Defendants in the Action as a basis for damage claims . . . ."  (Decl. Bailey, Ex. A ¶ 40.)  The settling defendants also agree that they "shall be enjoined from engaging in any conduct that constitutes a violation of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, for a period of five (5) years following the date of the order granting preliminary approval of the settlement[s]."  (*Id.* ¶ 31; *accord* Decl. Bailey, Ex. B ¶ 31.)

        In addition to releasing the settling defendants from antitrust claims, the settlement agreements also provide the following:

> In addition to the effect of any final judgment entered into in accordance with this Agreement, upon this Agreement becoming Finally Approved, and for other valuable consideration described herein, the Releasees shall be completely released, acquitted, and forever discharged from any and all claims, demands, actions, suits and causes of action, whether class, individual or otherwise in nature, that Releasors, or each of them, ever had, now has, or hereafter can, shall,

or may have on account of or arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries or damages, and the consequences thereof, arising out of or resulting from conduct concerning any agreement among Defendants, the reduction of restraint of supply, the reduction of or restrictions on production capacity, the allocation of markets or customers, the rigging of bids, or the pricing, selling, discounting, marketing, or distributing of Processed Tomato Products in the United States or elsewhere, including but not limited to any conduct alleged, and causes of action asserted, or that could have been alleged or asserted, whether or not concealed or hidden, in the Complaints filed in the Action . . . , which arise from or are predicated on the facts and/or actions described in the Complaints under any federal, state or foreign antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, trade practice, consumer protection, fraud, RICO, civil conspiracy law, or similar laws, including, without limitation, the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, from the beginning of time to the date of this Agreement . . . . The Releasors shall not, after the date of this agreement, seek to recover against any of the releases for any of the Released Claims. This Release is made without regard to the possibility of subsequent discovery or existence of different or additional facts.

. . . . Each Releasor waives California Civil Code Section 1542 and similar provisions in other states.

(Decl. Bailey, Ex. A ¶ 30; *accord* Decl. Bailey, Ex. B ¶ 30.)  The release provisions also provide that they "do not include respective claims by any of the Releasors or any of the Releasees relating to payment disputes in the ordinary course of business, physical harm, defective product or bodily injury. (Decl. Bailey, Ex. A ¶ 23; *accord* Decl. Bailey, Ex. B ¶ 23.)

According to plaintiffs' counsel's representations at the hearing, the two proposed settlement agreements are substantially similar, as the court's own review confirms, except to the extent that, "in the Los Gatos settlement agreement, there's a blowup provision where if 25 percent of the class members opt out, . . . then Los Gatos would have the opportunity to rescind the agreement."[5]  Counsel states that this provision is the only substantial difference between the two agreements.

Finally regarding costs and attorneys' fees, the settlement agreements also provide that "any costs incurred in providing any notice of the proposed settlement to Class Members, in claims administration, and any past or future litigation expenses award by the Court may be paid from the Settlement Fund."  (Decl. Bailey, Ex. A ¶ 23; *accord* Decl. Bailey, Ex. B ¶ 23.)  The settling defendants also agree they will "take no position on any application for attorneys' fees, reimbursement of costs and

---

[5] *See supra* note 1.

11

1  expenses or representative plaintiff service awards."  (Decl. Bailey, Ex. A ¶ 19; *accord* Decl. Bailey,

2  Ex. B ¶ 19.)  At the hearing, plaintiffs' counsel stated they will not seek attorneys' fees in excess of 25

3  percent of the recovery, and that "defendants have received assurances that the fees [plaintiffs' counsel

4  will request] here are certainly not going to be a windfall."[6]

5                        2.        Discussion

6              "At this preliminary approval stage, the court need only 'determine whether the

7  proposed settlement is within the range of possible approval.'"  *Murillo*, 266 F.R.D. at 479 (quoting

8  *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982)).  The following factors bear on the inquiry:

9              • the strength of plaintiff's case;

10             • the risk, expense, complexity, and likely duration of further
                litigation;

11

12             • the risk of maintaining class action status throughout the trial;

13             •  the amount offered in settlement;

14             • the extent of discovery completed, and the stage of the
                proceedings;

15             • the experience and views of counsel; . . . and

16             • the reaction of the class members to the proposed settlement.

17

18  *Hanlon*, 150 F.3d at 1026.  The court must also consider the value of the settlement offer and whether

19  the settlement is the result of collusion.  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1290, 1291

20  (9th Cir. 1992).  At the preliminary approval stage, the "initial evaluation can be made on the basis of

21  information [contained in] briefs, motions, or informal presentations by parties," MANUAL FOR

22  COMPLEX LITIGATION, *supra*, § 21.632, and "the Court need not review the settlement in detail at this

23  time . . . ."  *Durham v. Cont'l Cent. Credit, Inc.*, No. 07-cv-1763 BTM-WMC, 2011 WL 90253, at *2

24  (S.D. Cal. Jan. 10, 2011) (citing NEWBERG, *supra*, § 11.25).

25             The court has reviewed the proposed settlements' terms and moving papers.

26  Considered together with counsels' representations at the hearing, the court finds that the settlement

27  terms are at this time "within the range of possible approval."  *Murillo*, 266 F.R.D. at 479.  Plaintiffs'

28
_____

       [6] *See supra* note 1.

counsel declares he has extensive experience in food products antitrust class actions, (Decl. Bailey ¶ 12, ECF No. 208), and estimates the total recovery of $6.4 million "represents in or around 1% of Defendants' total sales of Processed Tomato Products during the Class Period," (Mot. 10:11–13, ECF No. 207).  Although the court has no documentary evidence before it to verify this claim, this percentage compares favorably with antitrust class action settlements ultimately approved by other courts.  *See, e.g.*, *Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985) (approving antitrust class action settlement that "represented approximately .2% of sales of $240 million during 1979–82.").  *See also Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.").

Moreover, plaintiffs point out the following facts obtained through investigation and discovery that would likely reduce the potential monetary recovery: "many of the sales during the period were pursuant to contracts executed before the alleged conspiracy, . . . some sales were between defendants, . . . some sales are excluded because of individual settlements,"  (Mot. 10:14–18, ECF 207), and some "sales were pursuant to cost-plus contracts," (*id.* at 14:2).  Each of these facts, if established, would diminish the recoverable damages as a percentage of total sales.  Further, plaintiffs' counsel points out that because "Ingomar and Greg Pruett were accepted into the DOJ's amnesty program, [they] would not be subject to either treble damages or joint and several liability in this case."  (*Id.* at 13:22–25.)  In addition, plaintiffs contend prosecuting these claims through trial would entail significant "[a]dditional risk and expense . . . related to experts."  (*Id.* at 13:8–13.)  *See also In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000) ("An antitrust class action is arguably the most complex action to prosecute."); *Am. Express Co. v. Italian Colors Rest.*, __ U.S. __, 133 S. Ct. 2304, 2316 & n.1 (2013) (Kagan, J., dissenting) (noting, in an antitrust class action, an essential expert report containing "an economic analysis defining the relevant markets, establishing [defendant]'s monopoly power, showing anticompetitive effects, and measuring damages . . . . would cost between several hundred thousand and one million dollars.").  Thus, class counsel appears to have a reasonable basis to conclude prosecution of this class action through trial would entail considerable cost and risk of non-recovery.

Finally, the court is satisfied that the settlement negotiations, conducted over several months including an eleven-hour mediation, do not appear on their face to have been the result of collusion, given that at this time, the attorneys' fees are not disproportionate to the settlement. *Cf. Bluetooth*, 654 F.3d at 946 ("One inherent risk is that class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee."). Therefore, the court preliminarily finds that the proposed settlements are within the range of possible approval under Rule 23(e).

All of the above said, the court's preliminary approval at this early stage is not without reservation. As it signaled at hearing, the court has several specific concerns that will need to be addressed before final approval. As a general matter, in circumstances such as this, in which the class representatives and defendants seek approval of a settlement negotiated before class certification, judicial scrutiny is particularly exacting. *Bluetooth*, 654 F.3d at 946 ("[W]here, as here, a settlement agreement is negotiated prior to formal class certification . . . , [the] agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."). That the parties came to terms during a mediation with a retired judge, although "a factor weighing in favor of a finding of non-collusiveness," is "not on its own dispositive." *Id.* at 948, 939 (reversing district court's approval of a class settlement even though settlement was reached during a "formal mediation session, overseen by a retired California Court of Appeal Justice."). Moreover, the settlement agreement contains a "clear sailing" provision, in which defendants agree not to contest the class counsels' application for attorneys' fees. This type of arrangement, "which carries [with it] 'the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class,'" also invites increased judicial scrutiny. *Id.* at 947 (quoting *Lobatz v. U.S. W. Cellular of Cal., Inc.*, 222 F. 3d 1142, 1148 (9th Cir. 2000)).

Additionally, as discussed at the hearing, the parties will need to provide the court additional evidence before the settlements are finally approved. For example, class counsel's bare declaration that he has "extensive experience in class action antitrust cases," (Decl. Bailey ¶ 12, ECF No. 208), is insufficient and must be substantiated by corroborating evidence. *See Bluetooth*, 654 F.3d

14

at 948 ("[T]he district court should have pressed the parties to substantiate their bald assertions with corroborating evidence.").  Plaintiffs' statement contained in their motion, that the settlement amounts to "1% of Defendants' total sales" and "represents 2.4% or more of the damages pool for each of the Settling Defendants," must be supported by testimonial or documentary evidence.  (Mot. 10:12–21, ECF No. 207.)  To the extent the parties are concerned that disclosure of this information might "reveal confidential information obtained by plaintiffs through mediation," (*id.* at 10 n.4), the court may be willing to review this information *in camera.  See Bowling v. Pfizer, Inc.*, 143 F.R.D. 138, 140 (S.D. Ohio 1992) (ordering "an *in camera* disclosure" of confidential information concerning "all past settlements made by the Defendants involving the Bjork–Shiley c/c heart valve"); MANUAL FOR COMPLEX LITIGATION, *supra*, § 21.631 ("A common practice is to receive information . . . *in camera*.").[7]

In addition, the court has the following questions for the parties in connection with consideration of final approval.  First, how do the monetary settlement terms, of $3.5 and $2.9 million, relate to the merits of the class members' antitrust claims?  The court directs the parties to provide evidentiary support, such as the mediation statements, to explain how these figures were reached.  Any explanation should include corroborating evidence that summarizes approximately how many agreements are not includible in the damages pool, because (1) they were between co-defendants, (2) they preceded the alleged conspiracy, (*cf.* Mot. 10:14–18, ECF No. 207), or (3) they were "cost-plus," (*cf. id.* at 14:2), as well as what proportional share of the total sales during the class period each of these components represents.  As for evidentiary support, plaintiffs' counsel stated at hearing that, although they did not consult experts, they had a "preliminary market report and a damages report" prepared that was "not detailed" and was "extrapolated based on certain assumptions."[8]  The court directs plaintiffs to provide these reports to assist the court in its "independent analysis of the settlement terms."  MANUAL FOR COMPLEX LITIGATION, *supra*, § 21.61.

Second, the court requires evidence concerning the mediation and negotiations of the proposed settlement agreements.  For example, the parties stated at hearing they would provide

---

[7] For the parties' convenience, this order's conclusion sets forth the manner through which the parties may submit documents for *in camera* review by the court.

[8] *See supra* note 1.

15

1   mediation statements and other documents concerning the mediation.  Bailey's declaration references

2   email communications concerning settlement negotiations, and these emails should be provided for

3   review.  (Decl. Bailey ¶ 9, ECF No. 208.)  The court requires this information to assess and "understand

4   the nature of the negotiations."  MANUAL FOR COMPLEX LITIGATION, *supra*, § 21.6.

5            Third, plaintiffs refer in their motion to "individual settlements" that reduce the amount

6   of damages, and at hearing, clarified there is only one such agreement "between Red Gold and

7   Ingomar."  (Mot. 10:16–18, ECF No. 207.)  Under Rule 23(e), "counsel must submit to the court . . . a

8   statement identifying any agreement made in connection with the" proposed class "settlement[s],

9   including all agreements and undertakings 'that, although seemingly separate, may have influenced the

10   terms of the settlement[s] by trading away possible advantages for the class in return for advantages for

11   others.  Doubts should be resolved in favor of identification.'"  MANUAL FOR COMPLEX LITIGATION,

12   *supra*, § 21.631 (quoting FED. R. CIV. P.  23(e)(2) advisory committee note).  The parties should provide

13   a summary or a copy of this individual agreement.  To the extent a summary or copy of this such

14   agreement "might raise confidentiality concerns," the parties may claim any applicable protections and

15   the court may "receive information about such agreement[] *in camera*."  *Id.*

16            Fourth, plaintiffs claim through putative class counsel that "many contracts" contain

17   "mandatory arbitration provisions" that "arguably reduce the amount of damages."  (Mot. 10:13–17,

18   ECF No. 207.)  At this point, on the record before it, the court cannot agree.  Presumably, an arbitration

19   agreement would simply vary the forum from a judicial to an arbitral setting and would have no impact

20   on the amount of recovery; if anything, the arbitration agreements would reduce litigation costs,

21   potentially increasing resources available to fund recovery.  *See Italian Colors Rest.*, 133 S. Ct. at 2312

22   (noting that "the principal advantage of arbitration [is] its informality," and that class litigation "makes

23   the process slower, more costly, and more likely to generate procedural morass than final judgment."

24   (internal quotation marks omitted) (quoting *AT&T Mobility L.L.C. v. Concepcion*, __ U.S. __, 131 S. Ct.

25   1740, 1751 (2011))).  Absent further explanation and support, the arbitration provisions will not be

26   considered by the court in evaluating the fundamental fairness of the settlement terms.

27            For the foregoing reasons, after a preliminary review of the parties' submission and in

28   light of the applicable law, the court finds that the settlement terms are, at this time, "within the range of

possible approval." *Murillo*, 266 F.R.D. at 479.  Plaintiffs' motion for preliminary approval of the class

settlement is GRANTED.

C.  Class Notice

For any class certified under Rule 23(b)(3), "the court must direct to class members the

best notice that is practicable under the circumstances."  FED. R. CIV. P. 23(c)(2)(B).  The notice must

state in plain, easily understood language:

- the nature of the action;

- the definition of the class certified;

- the class claims, issues, or defenses;

- that a class member may enter an appearance through an attorney if
  the member so desires;

- that the court will exclude from the class any member who requests
  exclusion;

- the time and manner for requesting exclusion; and

- the binding effect of a class judgment on members under Rule
  23(c)(3).

*Id.*

The court has reviewed the revised proposed "Notice of Class Action Settlement with

Certain Defendants and Final Approval Hearing" attached to Bailey's Declaration as Exhibit D, (ECF

No. 219-4), and finds that it fully conforms with due process and FED. R. CIV. P. 23(c)(2)(B).  The

proposed notice is appropriate because it adequately describes the terms of the proposed settlement,

informs the class about the allocation of attorneys' fees, and will provide specific and sufficient

information regarding the date, time, and place of the final approval hearing.  *See Vasquez v. Coast*

*Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1126–27 (E.D. Cal. 2009).

///

///

///

///

///

D.    <u>Final Approval Hearing Schedule</u>

The court adopts the following proposed hearing schedule:

| Date | Event |
|---|---|
| 21 Days[9] | All defendants produce the list of all potential class members, along with their mail and email addresses, to the extent reasonably feasible and subject to the availability of responsive information |
| 42 Days | Mailed notice sent to class members |
| 66 Days | Deadline for filing plaintiffs' petition for an award of attorneys' fees and reimbursement of expenses (plaintiffs' counsel shall also post a copy of the fee petition papers on the Settlement internet website at this time) |
| 87 Days | Deadlines for opting out of the Settlement Class and for objecting to the Settlement or to the petition for attorneys' fees and expenses |
| 101 Days | Deadline for filing list of any opt-outs with the court |
| 117 Days | Deadline for filing briefing in support of final approval of Settlement |
| June 6, 2014, at 10:00 a.m. in Courtroom 3 | Hearing on Final Approval of Settlement, Plan of Allocation, Award of Plaintiffs' Attorneys' Fees and Reimbursement of Expenses, and such other matters as the court may deem appropriate |

E.    <u>Class Counsel</u>

The court appoints Hausfeld LLP and Quinn Emanuel Urquhart & Sullivan LLP as class counsel.

---

[9] The number of days as used here refers to the number of days after the date on which this order is filed.

IV. <u>CONCLUSION</u>

For the forgoing reasons,

1. Hausfeld LLP and Quinn Emanuel Urquhart & Sullivan LLP are appointed as class counsel;

2. Preliminary certification of the following class and collective action is granted:

> All persons and entities that purchased tomato paste, tomato sauce, diced tomatoes or any other processed tomato product ("Processed Tomato Products") directly from Ingomar Packing Company, Los Gatos Tomato Products, or SK Foods, L.P. (collectively "Defendants") where the purchase was made pursuant to a contract made between February 1, 2005 and December 31, 2008.

> Excluded from the class are any judicial officer who is assigned to hear any aspect of the Four In One Company action or any related action, governmental entities, defendants, co-conspirators, purchasers who have an Individual Settlement Agreement (as defined in the Settlement Agreement) with Defendant(s), the present and former parents, predecessors, subsidiaries and affiliates of any of the foregoing, and the Plaintiffs in Case No. 09-cv-00208 pending in the United States District Court for the Eastern District of California.

3. Preliminary approval of the settlement is granted;

4. Approval of the proposed notice is granted; and

5. The proposed hearing schedule is adopted.

To the extent a party wishes to submit documents for which it requests *in camera* review to facilitate the final fairness determination under Rule 23, those submissions should be filed in the following manner. The party shall submit the documents "for conventional filing or lodging" in accordance with E.D. Cal. Local Rule 130(b), and notice of the *in camera* submission shall be served on all parties. The notice and conventional filing or lodging shall indicate conspicuously that the submission is for *in camera* review only.

IT IS SO ORDERED.

DATED:  January 2, 2014.

_____
UNITED STATES DISTRICT JUDGE