1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   FOUR IN ONE COMPANY, INC., et al.,        No.  2:08-cv-3017 KJM EFB

12            Plaintiffs,

13        v.

14   S.K. FOODS, L.P., et al.,                  ORDER

15            Defendants.

16

17

18              This case was on calendar on June 6, 2014 for a hearing on plaintiffs' motion for

19   an award of attorneys' fees and reimbursement of expenses and the final approval of the class

20   settlements in this case.  Steig Olson of Quinn Emanuel Urquhart & Sullivan LLP and Arthur

21   Bailey of Hausfeld LLP appeared for plaintiffs; George Nicoud and Steve Zovickian of Gibson,

22   Dunn & Crutcher, LLP appeared for defendants.

23   I.       PROCEDURAL BACKGROUND

24              This case arises from defendants' alleged conspiracy to fix the prices of tomato

25   paste, tomato sauce, and diced tomatoes ("processed tomato products").  Plaintiffs Four in One

26   Company, Inc., Diversified Foods & Seasonings, Inc., Bruce Foods Corporation, and Cliffstar

27   Corporation (collectively "plaintiffs") are food products manufacturers that purchased processed

28   tomato products directly from SK Foods, L.P., Ingomar Packing Company, Los Gatos Tomato

1

1   Products, Scott Salyer, Stuart Woolf and Greg Pruett (collectively "defendants"), beginning as

2   early as 2005 and continuing until at least December 2008.  Consolidated Class Action Compl.

3   ("Compl.") at 1, ECF No. 113.  Defendants are in the business of manufacturing processed

4   tomato products.  *Id.* at 2.

5          Plaintiffs brought five separate actions in 2008 and 2009: *Four in One Co., Inc. v.*

6   *SK Foods, L.P., et al.*, Case No. 2:08–cv–3017–KJM–EFB; *Diversified Food & Seasonings, Inc.*

7   *v. SK Foods, L.P.*, Case No. 2:08–cv–3074–KJM–EFB; *Bruce Foods Corp. v. SK Foods, L.P.,*

8   *et al.*, Case No. 2:09–cv–0027–KJM–EFB; *The Morning Star Packing Co. v. SK Foods, L.P.*,

9   Case No. 2:09–cv–00208–KJM–EFB; *Cliffstar Corp. v. SK Foods, L.P., et al.*, Case

10  No. 2:09-cv-0442–KJM–EFB.  On March 12, 2009, the court consolidated four of the lawsuits

11  into a single action, excluding The Morning Star Packing Co.'s lawsuit.  ECF No. 88.

12         Plaintiffs' consolidated class action complaint alleges the following.  Plaintiffs

13  were overcharged for processed tomato products as a result of defendants' anticompetitive

14  conduct.  Compl. ¶ 3.  Plaintiffs paid a higher price for the processed tomato products than they

15  would have paid absent the alleged unlawful activity.  *Id.*  Defendants thereby substantially

16  increased their profits.  *Id.*  Defendants restrained competition in violation of federal antitrust

17  laws.  *Id.* ¶¶ 129–134.  The complaint contains a single cause of action for violation of section 1

18  of the Sherman Act and section 4 of the Clayton Act.  *Id.* ¶ 129.

19         On May 8, 2009, the court permitted the United States government, through the

20  Antitrust Division of the U.S. Department of Justice (DOJ) and the U.S. Attorney's Office for the

21  Eastern District of California, to intervene in this action for the purpose of seeking to limit

22  discovery due to a related criminal matter.  ECF No. 100.

23         On May 11, 2009, SK Foods, L.P. filed a notice of the pendency of its bankruptcy

24  filing.  ECF No. 102.

25         On June 5, 2009, *L'Ottavo Ristorante, et. al. v. Ingomar Packing Co., et al.*, Case

26  No. 1:09–cv–00932–OWW–SMS, was identified as a related case.  ECF No. 103.

27  /////

28  /////

2

1    On September 13, 2013, plaintiffs filed a motion to certify the class and for

2    preliminary approval of settlements between and among plaintiffs and defendants Ingomar,

3    Pruett, Los Gatos and Woolf ("settling defendants").  ECF No. 206.

4    On January 2, 2014, the court appointed Hausfeld LLP and Quinn Emanuel

5    Urquhart & Sullivan LLP as class counsel.  It also granted preliminary certification of the listed

6    class and collective action, preliminary approval of the settlements, and approval of the proposed

7    notice. ECF No. 222.  Despite the court's preliminary finding that the proposed settlements were

8    within the range of possible approval under Rule 23(e), the court raised several concerns for the

9    parties to address prior to final approval.  *Id.* at 14.  First, the court directed the parties to provide

10   evidentiary support demonstrating how the monetary terms related to the merits of the class

11   members' antitrust claims.  *Id.* at 15.  Second, the court required evidence concerning the

12   mediation and negotiations of the proposed settlement agreements.  *Id.* at 15–16.  Third, the court

13   requested a summary or copy of the individual settlement agreement between Red Gold and

14   Ingomar.  *Id.* at 16.  Fourth, the court signaled its intent, absent further explanation and support,

15   to decline to consider the effects of an arbitration provision in the fundamental fairness analysis.

16   The court also required support for class counsel's "extensive experience in class action antitrust

17   cases."  *Id.* at 14.  In addition, the court required testimonial or documentary evidence pertaining

18   to the relationship between the settlement amounts, defendants' total sales and the damages pool

19   for the settling defendants.  *Id.* at 15.

20   On March 10, 2014, plaintiffs filed a motion for award of attorneys' fees and

21   reimbursement of expenses.  ECF No. 224.  On May 6, 2014, plaintiffs filed a motion for final

22   approval of class settlements.  ECF No. 233.  Plaintiffs' motion is joined by the settling

23   defendants.  ECF Nos. 229, 231–32.  Also on May 6, 2014, plaintiffs and the settling defendants

24   /////

25   /////

26   /////

27   /////

28   /////

1   submitted documents in support of the motion for final approval for *in camera* review.[1]   ECF

2   Nos. 230, 232-1, 234, 235.

3   II.      THE SETTLEMENT AGREEMENTS

4              The proposed settlement agreements contain the following provisions.

5   Defendants Ingomar Packing Company, LLC and Greg Pruett (collectively "Ingomar") agree to

6   pay $3.5 million for a complete release of all class members' antitrust claims against Ingomar,

7   Pruett, and all current and former employees and agents, successors and assigns of Ingomar.

8   Bailey Decl. Ex. A, ¶¶ 21–24, ECF No. 208-1 ("Ingomar Agreement").  Defendants Los Gatos

9   Tomato Products and Stuart Woolf (collectively "Los Gatos") agree to pay $2.9 million for a

10   release of all class members' antitrust claims against Los Gatos, Woolf, and all current and

11   former employees and agents, successors, and assigns of Los Gatos.  Bailey Decl. Ex. B,

12   ¶¶ 21-24, ECF No. 208-2 ("Los Gatos Agreement").  The funds were to be deposited into a

13   settlement fund in one lump sum no later than January 3, 2014, to be held in escrow until the

14   _____

15              [1] In light of the court's reliance on the parties' *in camera* submissions in approving the
    settlement agreements, the court has determined the *in camera* submissions should be filed on the

16   docket under seal.  Although there is a presumption in favor of maintaining public access to court
    records, *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006), settlement

17   negotiations and communications exchanged therein are inherently confidential, *see, e.g.*, *Cook v.
    Yellow Freight Sys., Inc.*, 132 F.R.D. 548, 554 (E.D. Cal. 1990) (precluding discovery of

18   settlement discussion documents, noting "[s]ettlement negotiations are typically punctuated with
    numerous instances of puffing and posturing since they are 'motivated by a desire for peace rather

19   than from a concession of the merits of the claim'" (quoting *United States v. Contra Costa Cnty.
    Water Dist.*, 678 F.2d 90, 92 (9th Cir. 1982))), *overruled on other grounds by Jaffee v. Redmond*,

20   518 U.S. 1 (1996); *see also Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d
    976, 980 (6th Cir. 2003) (explaining "there exists a strong public interest in favor of secrecy of

21   matters discussed by parties during settlement negotiations"), *citing with approval Cook*, 132
    F.R.D. at 554.  Moreover, settlement negotiations in this action, if accessed by the public, have

22   the potential of being used, for example, to gratify public spite or promote public scandal.  *See*
    *Kamakana*, 447 F.3d at 1179 ("In general, 'compelling reasons' sufficient to outweigh the

23   public's interest in disclosure and justify sealing court records exist when such 'court files might
    become a vehicle for improper purposes,' such as the use of records to gratify private spite,

24   promote public scandal, circulate libelous statements, or release trade secrets." (quoting *Nixon v.
    Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978))).  Considering these factors, the court finds

25   the need to protect the parties' settlement negotiations outweighs any necessity for disclosure.

26   Plaintiffs and the settling defendants shall have seven days from the date of this order to file
    objections to the court's plan to file under seal to preserve the record.  If no objections are

27   received, the submissions will be filed under seal by the Clerk of the Court.

28
                                                4

1   settlement agreements are finally approved and eventually distributed to class members as

2   approved by the court.  Ingomar Agreement ¶¶ 24–26; Los Gatos Agreement ¶¶ 24–26.  "The

3   Settlement Amount shall not be reduced because of any potential Class members who choose to

4   exclude themselves from the Class."  Ingomar Agreement ¶ 24; Los Gatos Agreement ¶ 24.

5          After final approval of the settlement agreements, class counsel will distribute

6   funds to the class members as approved by the court.  The settlement agreements direct class

7   counsel to "seek to obtain an order approving administration of claims and distributions to class

8   members."  They establish a limiting principle such that class counsel should avoid giving any

9   claimant or group of claimants a "windfall," reciting as an example a "per pound purchased cap

10  on the recovery of any individual claimant."  "Class Counsel must also use their best efforts to

11  use direct notice instead of notice by publication."  *See generally* Ingomar Agreement ¶ 26; Los

12  Gatos Agreement ¶ 26.

13         The releasors will have no recovery against the settling defendants other than the

14  settlement fund.  Furthermore, the settlement amounts will not be reduced if potential class

15  members opt out.  *See* Ingomar Agreement ¶ 24; Los Gatos Agreement ¶ 24.  "[U]ntil final

16  judgment is entered in this Action against all Defendants, the sales of Processed Tomato Products

17  by Pruett and Ingomar" and "Woolf and Los Gatos" "shall remain in the case against the

18  Non-Settling Defendants in the Action as a basis for damage claims . . . ."  Ingomar Agreement

19  ¶ 40; Los Gatos Agreement ¶ 40.

20         The settling defendants also agree they "shall be enjoined from engaging in any

21  conduct that constitutes a violation of the Sherman Antitrust Act, 15 U.S.C. § 1, for a period of

22  five (5) years following the date of the order granting preliminary approval of the settlement[s]."

23  Ingomar Agreement ¶ 31; Los Gatos Agreement ¶ 31.

24         In addition to releasing the settling defendants from antitrust claims, the settlement

25  agreements also provide the following:

26         In addition to the effect of any final judgment entered into in
           accordance with this Agreement, upon this Agreement becoming
27         Finally Approved, and for other valuable consideration described
           herein, the Releasees shall be completely released, acquitted, and
28         forever discharged from any and all claims, demands, actions, suits

and causes of action, whether class, individual or otherwise in nature, that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of or arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries or damages, and the consequences thereof, arising out of or resulting from conduct concerning any agreement among Defendants, the reduction of restraint of supply, the reduction of or restrictions on production capacity, the allocation of markets or customers, the rigging of bids, or the pricing, selling, discounting, marketing, or distributing of Processed Tomato Products in the United States or elsewhere, including but not limited to any conduct alleged, and causes of action asserted, or that could have been alleged or asserted, whether or not concealed or hidden, in the Complaints filed in the Action . . . , which arise from or are predicated on the facts and/or actions described in the Complaints under any federal, state or foreign antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, trade practice, consumer protection, fraud, RICO, civil conspiracy law, or similar laws, including, without limitation, the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, from the beginning of time to the date of this Agreement . . . . The Releasors shall not, after the date of this agreement, seek to recover against any of the releases for any of the Released Claims. This Release is made without regard to the possibility of subsequent discovery or existence of different or additional facts.

Ingomar Agreement ¶ 21; Los Gatos Agreement ¶ 21.

The release provisions contain plaintiffs' certification that they are "hereby expressly and fully, finally and forever waiv[ing] and relinquish[ing], and forever settl[ing] and releas[ing] any known or unknown, suspected or unsuspected, contingent or non-contingent, claim whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional fact, as well as any and all rights existing under . . . Section 1542 [of the California Civil Code]" or any equivalent present or future law or principle of law in any jurisdiction.  Ingomar Agreement ¶ 21; Los Gatos Agreement ¶ 21.  The release and discharge do not, however, include claims "relating to payment disputes in the ordinary course of business, physical harm, defective product or bodily injury."  Ingomar Agreement ¶ 23; Los Gatos Agreement ¶ 23.

The two proposed settlement agreements are substantially similar with a few differences.  First, the Los Gatos Agreement contains a "blow-out" clause.  *See* Manual on Complex Litigation § 22.922 (4th ed. 2004) (defining the term as an optional condition used by defendants in a Rule 23(b)(3) class action settlement requiring the number of opt-outs to remain

at or below a certain percentage or number of absent class members).  The agreement states, "in the event that class members representing 25% or more of the total sales of Processed Tomatoes [sic] Products . . . requests exclusion . . ., Woolf and Los Gatos may elect to terminate this settlement at their discretion and receive a refund of all monies paid, less any monies paid for class notice, by giving notice thereof within twenty-one (21) days of receipt . . . ."  Los Gatos Agreement ¶ 32.  Sales to Heinz and Red Gold are excluded from the total sales calculation.  *Id.*

Second, the Los Gatos Agreement contains a contingency clause specifically enumerating a reservation of rights in the event any of the following occur: "the Ingomar Settlement is not approved or is terminated," "the order and final judgment approving the Ingomar Settlement is entered but is substantially reversed, modified, or vacated," a "Bankruptcy Action Settlement [against either Salyer or S.K. Foods] is terminated," or "the order and final judgment approving the Bankruptcy Action is substantially reversed, modified, or vacated."  Los Gatos Agreement ¶¶ 39–40.

Third, the Ingomar Agreement contains a "cooperation agreement" in which Pruett and Ingomar agree to continue to cooperate to the extent required by the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108–237, tit. II, 118 Stat. 661 (2004).  Also, the Ingomar Agreement contains an express agreement by Pruett, Ingomar, class counsel, and plaintiffs' counsel that there has been no waiver of attorney-client privilege, work product immunity or any other privilege or protection.  Ingomar Agreement ¶¶ 35–36.

Attorneys' fees and expenses awarded by the court shall be paid from the settlement fund.  Ingomar Agreement ¶ 20; Los Gatos Agreement ¶ 20.  "[A]ny costs incurred in providing any notice of the proposed settlement to Class Members, in claims administration, and any past or future litigation expenses award by the Court may be paid from the Settlement Fund."  Ingomar Agreement ¶ 30; Los Gatos Agreement ¶ 30.  The settling defendants also agree they will "take no position on any application for attorneys' fees, reimbursement of costs and expenses or representative plaintiff service awards."  Ingomar Agreement ¶ 19; Los Gatos Agreement ¶ 19.  In addition, the agreements state class counsel will not seek attorneys' fees in excess of 25 percent of the settlement amount.   Ingomar Agreement ¶ 15; Los Gatos Agreement ¶ 15.

1    III.    CERTIFICATION

2            A party seeking to certify a class must demonstrate it has met the requirements of

3    Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b).

4    *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Ellis v. Costco Wholesale Corp.*,

5    657 F.3d 970, 979–80 (9th Cir. 2011).  Although the parties in this case have stipulated that a

6    class exists for purposes of settlement, the court must nevertheless undertake the Rule 23 inquiry

7    independently.  *West v. Circle K Stores, Inc.*, No. CIV. S–04–0438 WBS GGH, 2006 WL

8    1652598, at *2 (E.D. Cal. June 13, 2006).

9            Under Rule 23(a), before certifying a class, the court must be satisfied that:

10           (1) the class is so numerous that joinder of all members is
             impracticable (the "numerosity" requirement);
11

12           (2) there are questions of law or fact common to the class (the
             "commonality" requirement);

13           (3) the claims or defenses of representative parties are typical of the
             claims or defenses of the class (the "typicality" requirement); and
14

15           (4) the representative parties will fairly and adequately protect the
             interests of the class (the "adequacy of representation" inquiry).

16   *Collins v. Cargill Meat Solutions Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011) (quoting *In re Itel

17   Sec. Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981)); *accord* Fed. R. Civ. P. 23(a).

18           The court must also determine whether the proposed class satisfies Rule 23(b)(3),

19   on which plaintiffs rely in this action.  To meet the requirements of this subdivision of the rule,

20   the court must find that "'questions of law or fact common to class members predominate over

21   any questions affecting only individual members, and that a class action is superior to other

22   available methods for fairly and effectively adjudicating the controversy." *Wal-Mart Stores, Inc.

23   v. Dukes*, 131 S. Ct. 2541, 2558 (2011) (quoting Fed. R. Civ. P. 23(b)(3)).  "The matters pertinent

24   to these findings include: (A) the class members' interests in individually controlling the

25   prosecution or defense of separate actions; [and] (B) the extent and nature of any litigation

26   concerning the controversy already begun by or against class members . . . ."  Fed. R. Civ. P.

27   23(b)(3)(A)–(B).

28   /////

On September 13, 2013, plaintiffs filed a motion for certification of the following settlement class:

> All persons and entities that purchased tomato paste, tomato sauce, diced tomatoes or any other processed tomato product ("Processed Tomato Products") directly from Ingomar Packing Company, Los Gatos Tomato Products, or SK Foods, L.P. (collectively "Defendants") where the purchase was made pursuant to a contract made between February 1, 2005 and December 31, 2008.
>
> Excluded from the class are any judicial officer who is assigned to hear any aspect of the *Four in One Company* action or any related action, governmental entities, defendants, co-conspirators, purchasers who have an Individual Settlement Agreement (as defined in the Settlement Agreement) with Defendant(s), the present and former parents, predecessors, subsidiaries and affiliates of any of the foregoing, and the Plaintiffs in Case No. 09-cv-00208 pending in the United States District Court for the Eastern District of California.

ECF No. 206-1 at 2.

On January 2, 2014, the court preliminarily certified the proposed class, finding the class satisfied the numerosity, commonality, typicality and adequacy of representation requirements of Rule 23(a), ECF No. 222 at 6–8, as well as the predominance and superiority requirements of Rule 23(b)(3), *id.* at 9–10.

No party or class member has objected to certification of the settlement class, and there is nothing before the court to suggest this prior certification was improper. The court therefore finds certification of the class for the purpose of final approval of the settlement agreements is appropriate.

IV.    NOTICE TO, RESPONSE FROM, AND PAYMENT TO CLASS MEMBERS

The number of potential class members in this action is 476.  ECF No. 233-2 at 2. On February 13, 2014, the class administrator mailed notices and claim forms to potential class members informing them of the settlements.  ECF No. 233-2 at 2.  Of the 476 notice packets mailed to potential class members, 76 were returned as undeliverable without a forwarding address.  *Id.*  The parties explained at the June 6, 2014 hearing that this number is not surprising considering many of the purchases at issue were made approximately six-and-a-half to nine-and-a-half years ago.  Potential class members' exclusions were to be postmarked by March 30, 2014.

9

1   ECF No. 222 at 18.  To participate in the settlements, potential class members must have

2   completed and submitted a claim form by May 30, 2014.  ECF No. 233-2 at 9.

3          During the hearing on the motion for final approval, class counsel explained that

4   of the 400 notice packets successfully mailed to potential class members, the class administrator

5   received 110 completed claim forms, which represents a 27.5 percent response rate.  The parties

6   explained that the 110 returned claim forms represent the biggest purchasers, comprising

7   79 percent of Ingomar's total sales and 85 percent of Los Gatos's sales.  The class administrator

8   received no requests to opt out of the settlements.

9   V.      THE SETTLEMENT AND FAIRNESS

10         A.      Legal Framework

11         When the parties reach settlement of a class action, the court cannot simply accept

12   the parties' resolution but must also satisfy itself that the proposed settlement is "fundamentally

13   fair, adequate, and reasonable."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

14   After the initial certification and notice to the class, the court conducts a fairness hearing before

15   finally approving any proposed settlement.  *Narouz v. Charter Commc'ns, Inc.*, 591 F.3d 1261,

16   1267 (9th Cir. 2010); Fed. R. Civ. P. 23(e)(2) ("If the proposal would bind class members, the

17   court may approve it only after a hearing and on finding that it is fair, reasonable, and

18   adequate.").  The court must balance a number of factors in determining whether the proposed

19   settlement is fair, adequate and reasonable:

20              the strength of the plaintiffs' case; the risk, expense, complexity,
                and likely duration of further litigation; the risk of maintaining class
21              action status throughout the trial; the amount offered in settlement;
                the extent of discovery completed and the stage of the proceedings;
22              the experience and views of counsel; the presence of a
                governmental participant; and the reaction of the class members to
23              the proposed settlement.

24   *Hanlon*, 150 F.3d at 1026; *Adoma v. Univ. of Phx.*, 913 F. Supp. 2d 964, 974–75 (E.D. Cal.

25   2012).  The list is not exhaustive and the factors may be applied differently in different

26   circumstances.  *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615,

27   625 (9th Cir. 1982).

28   /////

1   The court must consider the settlement as a whole, rather than its component parts,

2   in evaluating fairness and it "must stand or fall in its entirety." *Hanlon*, 150 F.3d at 1026.

3   Ultimately, the court must reach "a reasoned judgment that the agreement is not the product of

4   fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement,

5   taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d

6   at 625.

7          B.      Strength of Plaintiff's Case

8          When assessing the strength of plaintiff's case, the court does not reach "any

9   ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this

10  litigation." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz.

11  1989).  The court cannot reach such a conclusion, because evidence has not been fully presented

12  and the "settlements were induced in large part by the very uncertainty as to what the outcome

13  would be, had litigation continued." *Id.*  Instead, the court is to "evaluate objectively the

14  strengths and weaknesses inherent in the litigation and the impact of those considerations on the

15  parties' decisions to reach these agreements." *Id.*

16         While plaintiffs believe they have a strong case, they affirm discovery revealed

17  several issues favoring settlement.  For example, plaintiffs point to the risks that the class may not

18  have obtained certification, or a favorable damages award from a jury may not have been

19  realized.  ECF No. 233-1 at 15.  With regard to a favorable jury award, plaintiffs note after

20  hearing expert witness testimony, a jury might determine there were little or no damages.  *Id.*

21  This risk favors settlement considering in antitrust litigation actions, such as this one, plaintiffs

22  are faced with the challenging task of proving damages at trial.  *See Rodriguez v. W. Publ'g*

23  *Corp.*, No. CV05–3222 R(MCx), 2007 WL 2827379, at *7 (C.D. Cal. Sept. 10, 2007) (noting

24  "[c]laims for violation of federal antitrust laws are notoriously difficult to prove" (citing *Palmer*

25  *v. BRG*, 498 U.S. 46, 48 (1990))), *aff'd in part*, *rev'd in part*, 563 F.3d 948 (9th Cir. 2009); *see*

26  *also In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 207–08, 213

27  (D. Me. 2003) (explaining the difficulty in proving antitrust damage causation at trial).

28  /////

1          Another burden plaintiffs face in developing the strength of their case is the court-

2    ordered limit on discovery.  In light of an ongoing investigation into criminal conduct in the

3    tomato processing industry involving the same conduct alleged in this action, the court granted

4    the DOJ's motion to intervene to limit certain discovery.  ECF No. 100.  The court's limit has

5    been extended several times while the criminal investigation proceeded.  *See*, *e.g.*, ECF Nos. 167,

6    186.  As a result, plaintiffs have been unable to conduct depositions in an effort to bolster or test

7    the strength of their case.  *See*, *e.g.*, *Shames v. Hertz Corp.*, No. 07-CV-2174–MMA(WMC),

8    2012 WL 5392159, at *5 (S.D. Cal. Nov. 5, 2012) (finding an immunity argument that would

9    have shielded evidence from the plaintiffs posed a risk to the strength of the plaintiffs' case).

10   While the court's limit on discovery presumably would lift once the criminal proceeding

11   concluded, there currently is no indication of when that will be, and the passage of time could

12   impact potential deponents' memories and availability.  Moreover, the continued cost of

13   maintaining their action while waiting for the opportunity to conduct discovery could have

14   hindered plaintiffs' progress.

15          This factor favors approving the settlements.

16   C.     Risk, Expense, Complexity and Likely Duration of Further Litigation; Risk of
            Maintaining Class Status
17

18          "Approval of settlement is 'preferable to lengthy and expensive litigation with

19   uncertain results.'"  *Morales v. Stevco, Inc.*, No. 1:09–cv–00704 AWI JLT, 2011 WL 5511767, at

20   *10 (E.D. Cal. Nov. 10, 2011) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*

21   (*DIRECTV*), 221 F.R.D. 523, 526 (C.D. Cal. 2004)).  The Ninth Circuit has explained "there is a

22   strong judicial policy that favors settlements, particularly where complex class action litigation is

23   concerned."  *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) (citing *Class*

24   *Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).  "'[I]t must not be overlooked

25   that voluntary conciliation and settlement are the preferred means of dispute resolution.  This is

26   especially true in complex class action litigation . . . .'"  *Id.* (quoting *Officers for Justice*, 688 F.2d

27   at 625).

28   /////

12

Plaintiffs explain the effort and expense necessary to litigate this complex antitrust action through trial could well yield a damages award comparable to the proposed settlements. At the same time, plaintiffs would risk not being able to collect a higher damages award.  This risk is especially probable in light of the related criminal and bankruptcy proceedings, as outlined in plaintiffs' memorandum in support of their motion for preliminary approval of settlements. ECF No. 207 at 12–14.  In the related proceedings, defendant Salyer entered a plea agreement and pled guilty to racketeering and price-fixing charges on March 23, 2012. *Id.* at 12.  Other individuals have been indicted on similar charges as recently as December 17, 2013. *Id.* at 13. Ingomar and Pruett received leniency under the DOJ's antitrust leniency program. *Id.* at 12.  As a result, these two defendants would not be subject to treble damages or joint and several liability. *Id.* at 21.  SK Foods filed for chapter 11 bankruptcy on May 5, 2009. *Id.* at 13.  Plaintiffs filed class proofs of claims with the bankruptcy court; and the bankruptcy court certified a settlement class. *Id.*  Plaintiffs confirmed at the final approval hearing the class will receive approximately 9 to 10 percent of the claimed amount of $70 million, but the amount will not be distributed immediately.  Finally, plaintiffs note Los Gatos credibly asserted a financial condition that would "greatly preclude[e]" its ability to pay a larger damages award.  ECF No. 233-1 at 15.

Given the complexity of the action and related criminal and bankruptcy proceedings, the risk and expense of litigating this action through trial and possibly subsequent appeals is apparent. *See* ECF No. 233-1 at 18.  While the proposed settlements were reached fairly early in the litigation process, before any dispositive motions were filed, if the settlements are not approved, the parties will be faced with expensive, ongoing litigation.  Considering the already high costs incurred by plaintiffs' counsel at this juncture, the risk factor weighs in favor of approval.

The court also considers the risk that the proposed class may not be certified or may face decertification. *See Rodriguez*, 563 F.3d at 966 ("A district court may decertify a class at any time." (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982))).  While the court may have maintained certification of the proposed class, there remains a risk defendants will challenge

/////

1   the certification and the court may decertify the class before trial, as evidenced by the parties' *in*

2   *camera* submissions.  *See* ECF No. 233-1 at 15.

3              These factors weigh in favor of approving the settlements.

4        D.      Amount Offered in Settlement

5              Plaintiffs sought compensatory and treble damages and reached proposed

6   settlements of $3.5 million with Ingomar and $2.9 million with Los Gatos, for a total of

7   $6.4 million.

8              In the court's order granting preliminary approval of the settlements, the court

9   directed the parties to provide the court with substantial corroborating evidence in support of the

10  settlement amounts.  ECF No. 222 at 15–16.  Specifically, the parties were to address the court's

11  reservations regarding: (1) plaintiffs' statement that the settlement amounts to 1 percent of

12  defendants' total sales and 2.4 percent or more of the damages pool for each of the settling

13  defendants; (2) how "the monetary settlement terms, of $3.5 and $2.9 million, relate to the merits

14  of the class members' antitrust claims"; (3) "the mediation and negotiations of the proposed

15  settlement agreements" including mediation statements and related e-mails; and (4) the individual

16  settlement agreement between Ingomar and Red Gold.  *Id.*

17             In response, plaintiffs Ingomar and Los Gatos provided several documents for *in*

18  *camera* review.  The documents include plaintiffs' preliminary damages estimate, copies of the

19  parties' mediation statements, e-mails between the parties related to settlement negotiations, the

20  Red Gold settlement agreement and a summary of Ingomar's and Los Gatos' total sales.

21             With regard to plaintiffs' statement that the settlement amounts to 1 percent of

22  defendants' total sales, the parties provided a summary of the settling defendants' total sales.[2]

23  The declaration of Arthur Bailey, submitted with plaintiffs' *in camera* documents, articulates the

24  parties' calculations.  Mr. Bailey's *in camera* declaration also explains how the parties

25  determined the settlement amounts as 2.4 percent or more of the damages pool.  The court finds

26         [2] In accordance with the court's order granting preliminary approval, defendants' total
    sales include "mandatory arbitration provisions."  *See* ECF No. 222 at 16 (noting "an arbitration
27  agreement would simply vary the forum from a judicial to an arbitral setting and would have no
    impact on the amount of recovery" (citing *Am. Express Co. v. Italian Colors Rest.*, ___ U.S. ___,
28  133 S. Ct. 2304, 2312 (2013))).

the parties' estimates are sufficiently corroborated by supporting documentation.

Finally, while the settlement amount represents a small fraction of the estimated damages, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair." *Officers for Justice*, 688 F.2d at 628.  "[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.  The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Id.* at 625 (citations omitted); *see also Collins*, 274 F.R.D. at 302 (a court must "'consider plaintiffs' expected recovery balanced against the value of the settlement offer'" (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007))); *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 336 (D.N.J. 2002) (approving settlement representing less than two percent of the maximum possible recovery), *cited in Hopson v. Hanesbrands Inc.*, No. CV–08–0844 EDL, 2009 WL 928133, at *8 (N.D. Cal. Apr. 3, 2009). The court finds the settlement amount weighs slightly in favor of approval in light of the uncertainties involved in litigating this action.

On balance, the settlement amount factor weighs in favor of approving the settlements.

E.      Extent of Discovery and Stage of the Proceedings

"In the context of class action settlement, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (quoting *In re Chicken Antitrust Litig.*, 669 F.2d 228, 241 (5th Cir. 1982)).

Here, the parties conducted document discovery resulting in the production of 240,000 pages of documents as well as additional documents obtained through bankruptcy proceedings.  ECF No. 233-1 at 21.  While the court prohibited the parties from engaging in depositions due to the related criminal proceedings, the document production facilitated meaningful negotiations between the parties and enabled them to make an informed decision regarding settlement.  *See*, *e.g.*, *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 454 (E.D.

15

1   Cal. 2013) ("approval of a class action settlement is proper as long as discovery allowed the

2   parties to form a clear view of the strengths and weaknesses of their cases" (citation omitted)).

3   Moreover, as revealed by plaintiffs' *in camera* submission, plaintiffs' counsel conducted

4   significant independent investigation and research, which further informed the parties'

5   discussions.

6           This factor weighs in favor of approving the settlement agreements.

7       F.      Experience and Views of Counsel

8           In the court's order preliminarily approving the settlements, the parties were

9   directed to provide the court with evidence of class counsel's experience in class action antitrust

10  cases.  ECF No. 222 at 14.  The two firms representing the class, Quinn Emanuel and Hausfeld

11  submitted declarations that sufficiently establish their experience in class action antitrust

12  litigation.  ECF No. 224-3 at 1–2; ECF No. 224-6 at 1–4.  Given the experience of counsel, this

13  factor favors approving the settlements.  *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D.

14  431, 447 (E.D. Cal. 2013).

15      G.      Reaction of the Class

16          "It is established that the absence of a large number of objections to a proposed

17  class action settlement raises a strong presumption that the terms of a proposed class settlement

18  action are favorable to the class members."  *DIRECTV*, 221 F.R.D. at 529 (citations omitted).

19          During the final approval hearing, the parties confirmed the class administrator

20  received no opt out forms or objections from potential class members.  As noted, of the 400

21  notice packets that were successfully mailed to potential class members, the class administrator

22  received 110 claim forms, which equates to a 27.5 percent response rate.  These 110 returned

23  claim forms represent the biggest purchasers, comprising 79 percent of Ingomar's total sales and

24  85 percent of Los Gatos' sales.  The response rate was not surprising to the parties who explained

25  during the hearing the rate is in fact high compared to other response rates considered by courts.

26  *See*, *e.g.*, *Touhey v. United States*, No. EDCV 08–01418–VAP (RCx), 2011 WL 3179036, at *7–

27  8 (C.D. Cal. Jul. 25, 2011) (finding a two percent response rate did not render settlement unfair);

28  *In re Packaged Ice Antitrust Litig.*, No. 08–MDL–01942, 2011 WL 6209188, at *14 (E.D. Mich.

Dec. 13, 2011) (finding settlement fair even when only one percent responded to notices when that one percent represented forty-six percent of defendant's total sales).  Defendant Ingomar joins plaintiffs' motion, specifically asserting that not one of the potential class members, comprised of "many of the largest and most sophisticated food companies in the world," objected or opted out strongly favors approval of the settlements.  ECF No. 231 (citing *In re Art Materials Antitrust Litig.*, 100 F.R.D. 367, 372 (N.D. Ohio 1983)).

Considering the relatively favorable response rate and the percentage of sales represented by the claim forms received, the court finds this factor weighs in favor of approving the settlements.  *See*, *e.g.*, *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) ("By any standard, the lack of objection of the Class Members favors approval of the Settlement." (citations omitted)).

H.      Possibility of Collusion

Before approving a settlement, the court must consider whether it is the product of collusion.  *Hanlon*, 150 F.3d at 1026; *Monterrubio*, 291 F.R.D. at 453–54.

Here, the parties engaged in extensive settlement negotiations involving telephonic and e-mail communications between June 2009 and April 2013.  *See* ECF No. 207 at 20; *see also* ECF No. 233-1 at 13–14.  The parties finally reached settlement agreements following an eleven-hour joint mediation session on April 29, 2013.  ECF No. 233-1 at 14; *see In re Bluetooth Headset Prods. Liability Litig.* (*Bluetooth*), 654 F.3d 935, 948 (9th Cir. 2011) (participation of mediator is not dispositive, but is "a factor weighing in favor of a finding of non-collusiveness").  The parties' private mediation took place before a neutral mediator, the Honorable Layn R. Phillips of the California Academy of Distinguished Neutrals, an experienced mediator.  In advance of the mediation session, the parties prepared detailed confidential mediation statements and draft settlement terms.  ECF No. 233-1 at 14.  The court class reviewed the parties' negotiations, including mediation statements and e-mail communications, which were submitted for *in camera* review.  The court finds no objective signs of collusion in this action.  Accordingly, this factor weighs in favor of approving the settlement.  *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 457–58 (C.D. Cal. 2014).

After carefully reviewing the parties' submissions in light of the relevant factors, for the reasons discussed above, the motion for final approval of class settlements is GRANTED.

VI.     ATTORNEYS' FEES AND COSTS

Plaintiffs' counsel seek an award of attorneys' fees in the amount of $1.6 million, which represents 25 percent of the $6.4 million settlement fund.  ECF No. 224-1 at 6.  Plaintiffs' counsel also seek an award of costs in the amount of $267,926.23.  *Id.*

A.     Class Counsels' Request for Attorneys' Fees

Rule 23 permits a court to award "reasonable attorney's fees . . . that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  Even when the parties have agreed on an amount, the court must award only reasonable attorneys' fees in a class action settlement.  *Bluetooth*, 654 F.3d at 941.  "Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method."  *Id.* at 942.  If the court employs the percentage-of-recovery method, "calculation of the lodestar amount may be used as a cross-check to assess the reasonableness of the percentage award."  *Adoma*, 913 F. Supp. 2d at 981.  The court must employ the method that will produce a reasonable result.  *Bluetooth*, 654 F.3d at 942.

In the Ninth Circuit, the benchmark for percentage of recovery awards is 25 percent of the total settlement award, which may be adjusted up or down.  *Hanlon*, 150 F.3d at 1029; *Ross v. U.S. Bank Nat'l Ass'n*, No. C 07–02951 SI, 2010 WL 3833922, at *2 (N.D. Cal. Sept. 29, 2010) (stating selection of benchmark must be based on all circumstances of the case).

Factors that may justify departure from the benchmark include:  (1) the result obtained; (2) counsel's efforts, experience, and skill; (3) the complexity of the issues; (4) the risks of non-payment assumed by counsel; (5) the reaction of the class; (6) non-monetary benefits, such as clarification of certain points of law; and (6) comparison with the lodestar.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002).  Additional factors include whether counsel receives a disproportionate distribution of the settlement, whether the parties have agreed to a "clear sailing" arrangement whereby defendant will not object to counsel's request for fees, /////

1  and whether any fees not awarded will revert to defendants rather than be added to the class fund.

2  *Bluetooth*, 654 F. 3d at 947.

3         1.     The Result Obtained

4        Class counsel secured a settlement of approximately 1 percent of the settling

5  defendants' total sales of tomato products during the class period.  As noted in the motion for

6  attorneys' fees, "various facts exist which arguably reduce the amount of damages to the Class

7  attributable to sales by Los Gatos and Ingomar."  ECF No. 224-1 at 12.  While the settlement

8  amount is not extraordinary, the fact that class counsel obtained a settlement early in litigation

9  and avoided increased costs of litigation weighs in favor of a benchmark award of 25 percent of

10  the settlement fund.

11         2.     The Risks Involved

12        As noted, class counsel believe plaintiffs' case is strong, yet recognize the risk and

13  expense necessary to litigate this complex class action.  ECF No. 224-1 at 12.  The settling

14  defendants believe strongly in their position and would have contested liability.  Plaintiffs note

15  additional risks of continuing to litigate the action include determining damages, which is an

16  "expert-intensive uncertain process[] often involving conflicting testimony," and the possibility a

17  jury could find either no damages or a fraction of the damages contended.  ECF No. 224-1 at

18  13-14.  Other risks served as obstacles for plaintiffs, including defendants Ingomar and Pruett's

19  acceptance into the DOJ's amnesty program, and a portion of the settling defendants' sales may

20  not have been subject to damages because sales were made through contracts entered into outside

21  the conspiracy period.  *Id.* at 14.  Finally, as noted, a challenge to class certification, evidenced by

22  the parties' *in camera* submissions, could potentially have justified decertification at trial.

23  Accordingly, this factor weighs in favor of a benchmark award of 25 percent of the settlement

24  fund.

25         3.     Counsel's Efforts, Experience and Skill; Complexity of the Issues

26        As discussed above, the two firms representing the class, Quinn Emanuel and

27  Hausfeld, have substantial experience in antitrust class action litigation.  Class counsel confirmed

28  during the hearing the remaining firms representing plaintiffs also have relevant experience and

1    skills in antitrust class actions.  The court is satisfied counsels' experience supports a benchmark

2    award of 25 percent.

3           The antitrust issues involved in this litigation as well as the investment of time on

4    the part of the firms involved were substantial.  The litigation involves four consolidated actions,

5    and related bankruptcy and criminal proceedings.  Thus, the complexity of the issues and the

6    efforts required by counsel involved also weigh in favor of a benchmark award of 25 percent of

7    the settlement fund.

8                  4.      Lodestar Cross-Check

9           In calculating an attorneys' fee award using the lodestar method, a court must start

10   by determining how many hours were reasonably expended on the litigation, and then multiply

11   those hours by the prevailing local rate for an attorney of the skill required to perform the

12   litigation.  *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008).  When a court

13   uses the lodestar as a cross-check to a percentage claim of fees, it need only make a "rough

14   calculation."  *Schiller v. David's Bridal, Inc.*, No. 1:10–cv–00616–AWI–SKO, 2012 WL

15   2117001, at *22 (E.D. Cal. June 11, 2012).

16          Here, plaintiffs' attorneys claim a lodestar of approximately $5,136,097.75, which

17   represents 11,754.70 hours billed by 162 attorneys and professional support staff at various

18   billing rates from 18 separate law firms.  ECF No. 224.  The average billing rate used by the firms

19   is approximately $436 per hour.  This rate was used across the board for the 11,754.70 hours

20   billed by plaintiffs' attorneys to reach the $5,136,097.75 lodestar calculation.  The firms have not

21   provided statements in support of their hourly rates, evidence their rates are in line with those in

22   the community, *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984), or itemized records to support

23   the number of hours they worked, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  Nonetheless,

24   the court finds the "rough calculation" of plaintiffs' attorneys' fee is acceptable in this action.

25   *Schiller*, 2012 WL 2117001, at *22; *see also Barbosa*, 297 F.R.D. at 451–52 ("Where the lodestar

26   method is used as a cross-check to the percentage method, it can be performed with a less

27   exhaustive cataloguing and review of counsel's hours." (citing *In re Rite Aid Corp. Sec. Litig.*,

28   396 F.3d 294, 306 (3d Cir. 2005); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1176

1    (S.D. Cal. 2007))).  Further, the average hourly rate of $436 is not extraordinarily high

2    considering plaintiffs' counsels' experience and skill in complex antitrust class action litigation,

3    and the rates approved in other local class action cases.  *See Monterrubio*, 291 F.R.D. at 460

4    (noting the "'prevailing hourly rates in the Eastern District of California are in the $400/hour

5    range'" (quoting *Bond v. Ferguson Enters., Inc.*, No. 1:09–cv–1662 OWW MJS, 2011 WL

6    2648879, at *12 (E.D. Cal. June 30, 2011))).  A lodestar cross-check confirms 25 percent of the

7    $6.4 million settlement fund is a reasonable fee award for plaintiffs' counsel here.  *Vizcaino*, 290

8    F.3d at 1050 ("Calculation of the lodestar, which measures the lawyers' investment of time in the

9    litigation, provides a check on the reasonableness of the percentage award.").

10          Accordingly, class counsels' motion for attorneys' fees in the amount of

11   $1.6 million is GRANTED.

12          B.      Class Counsels' Request for Litigation Costs

13          The court must determine an appropriate award of costs and expenses.  Fed. R.

14   Civ. P. 23(h).  "[I]n evaluating the reasonableness of costs, 'the judge has to step in and play

15   surrogate client.'"  *FACTA*, 295 F.R.D. at 469 (quoting *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d

16   566, 572 (7th Cir. 1992)).  "In keeping with this role, the court must examine prevailing rates and

17   practices in the legal marketplace to assess the reasonableness of the costs sought."  *Id.* (citing

18   *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 286–87 (1989)).

19          Counsel has submitted records showing plaintiffs' firms incurred $267,926.23 in

20   costs.  The largest expenditures are $46,810.88 for professional services requested by Quinn

21   Emanuel, and $46,806.56 for data extraction requested by Hausfeld.  ECF Nos. 224-5 at 47,

22   224-9 at 4–6.  During the hearing on the motion for costs, the court questioned class counsel

23   regarding these expenditures.  Class counsel explained these costs covered hosting the database of

24   the 240,000 discovery documents and expert analysis relied on during the parties' settlement

25   negotiations.  The court finds these costs reasonable.

26          Another relatively large expenditure is $30,000 for class administrative services,

27   requested by Hausfeld.  A declaration by the class administrator was provided in support of

28   plaintiffs' motion for final approval of class settlement and describes the steps taken to notify the

1   potential class members.  *See* ECF No. 233-2.  When questioned during the hearing regarding this

2   expenditure, class counsel explained the fee was negotiated with the claims administrator as a

3   capped amount guaranteed not to exceed $30,000.  Counsel explained the class administrator is

4   responsible for administering the settlements over the next six to twelve months, and is an

5   experienced claims administrator.  The court finds the request for class administrative services

6   reasonable.  *See*, *e.g.*, *Garcia v. Gordon Trucking, Inc.*, No. 1:10–CV–0324–AWI–SKO, 2012

7   WL 5364575, at *3 (E.D. Cal. Oct. 31, 2012) (approving $25,000 administrator fee awarded in

8   wage and hour case involving 1868 potential class members); *Vasquez v. Coast Valley Roofing,*

9   *Inc.*, 266 F.R.D. 482, 484 (E.D. Cal. 2010) (approving $25,000 administrator fee awarded in

10   wage and hour case involving 177 potential class members).

11          Class counsel also seek reimbursement for the mediation fee in the amount of

12   $8,287.50.  ECF No. 224-5 at 44.  Courts routinely approve reimbursement of this cost.  *See*, *e.g.*,

13   *Pierce v. Rosetta Stone, Ltd*., Case No: C 11–01283 SBA, 2013 WL 5402120, at *6 (N.D. Cal.

14   Sept. 26, 2013).

15          The court approves the balance of the costs requested by class counsel without

16   individualized analysis of each cost.  *See*, *e.g.*, *FACTA*, 295 F.R.D. at 469 ("'Expenses such as

17   reimbursement for travel, meals, lodging, photocopying, long-distance telephone calls, computer

18   legal research, postage, courier service, mediation, exhibits, documents scanning, and visual

19   equipment are typically recoverable.'" (quoting *Rutti v. Lojack Corp., Inc.*, No. SACV 06–350

20   DOC (JCx), 2012 WL 3151077, at *12 (C.D. Cal. July 31, 2012))).

21          After carefully reviewing the summary of expenditures and in light of class

22   counsels' representations to the court during the final approval hearing, the motion for

23   reimbursement of costs in the amount of $267,926.23 is GRANTED.

24   VII.    CONCLUSION

25          IT IS HEREBY ORDERED that within seven days from the date of this order,

26   plaintiffs and the settling defendants shall file objections, if any, to the filing under seal of the *in*

27   *camera* submissions.  *See* ECF Nos. 230, 232-1, 234, 235.  If no objections are received, the

28   submissions will be filed under seal by the Clerk of the Court.

22

1    IT IS FURTHER ORDERED that plaintiffs' motion for final approval of the class

2   and collective actions settlements is GRANTED as follows:

3    1.    Solely for the purpose of the two settlements and based on Federal Rule of

4   Civil Procedure 23, the court hereby certifies the following class:

> All persons and entities that purchased tomato paste, tomato sauce, diced tomatoes or any other processed tomato product ("Processed Tomato Products") directly from Ingomar Packing Company, Los Gatos Tomato Products, or SK Foods, L.P. (collectively "Defendants") where the purchase was made pursuant to a contract made between February 1, 2005 and December 31, 2008.

> Excluded from the class are any judicial officer who is assigned to hear any aspect of the *Four In One Company* action or any related action, governmental entities, defendants, coconspirators, purchasers who have an Individual Settlement Agreement (as defined in the Settlement Agreement) with Defendant(s), the present and former parents, predecessors, subsidiaries and affiliates of any of the foregoing, and the Plaintiffs in Case No. 09-cv-00208 pending in the United States District Court for the Eastern District of California.

2.    The court hereby approves the terms of the settlement agreements as fair, reasonable, and adequate as they apply to the class, and directs consummation of all the agreements' terms and provisions.

3.    The settlement agreements shall be binding on Ingomar, Los Gatos and all plaintiffs, including all members of the class, under the settlement agreements.

4.    The court dismisses on the merits and with prejudice the consolidated class action complaint as to Ingomar and Los Gatos.

5.    The plan of allocation providing for a *pro rata* distribution of the net settlement fund based on verified claimants' volume of qualifying purchases, is fair, adequate, and reasonable, and is hereby approved.

6.    The court in its discretion declines to maintain jurisdiction to enforce the terms of the parties' settlement agreements.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994); *cf. Collins v. Thompson*, 8 F.3d 657, 659 (9th Cir. 1993).  Unless there is some independent basis for federal jurisdiction, enforcement of the agreements is for the state courts. *Kokkonen*, 511 U.S. at 382.

23

7.      No later than sixty days after the date of this order the claims administrator shall disburse the settlement amount due to each class member.

8.      Class counsel is entitled to fees in the amount of $1.6 million.

9.      Class counsel is entitled to costs in the amount of $267,926.23.

10.     No later than fourteen days after the date of this order the claims administrator shall disburse attorneys' fees and costs.

DATED:  August 13, 2014.

_____
UNITED STATES DISTRICT JUDGE